[No. F051953. Fifth Dist. Nov. 9, 2007.]

PORTERVILLE CITIZENS FOR RESPONSIBLE HILLSIDE
DEVELOPMENT, Plaintiff and Respondent, v.
CITY OF PORTERVILLE et al., Defendants and Respondents;
CONTOUR DEVELOPMENT, INC., Real Party in Interest and Appellant.

**COUNSEL**

Abbott & Kindermann, William Abbott, Joseph Wells Ellinwood and Glen C. Hansen for Real Party in Interest and Appellant.

No appearance for Defendants and Respondents.

Lanahan & Reilly and Richard L. Harriman for Plaintiff and Respondent.

OPINION

**LEVY, Acting P. J.—**

## INTRODUCTION

Appellant and real party in interest Contour Development, Inc. (Contour), seeks to build a subdivision of 219 single-family homes (the housing project) on a hillside in the east side of the City of Porterville (City). Following preparation of an initial study, a mitigated negative declaration was prepared (the MND). After two public hearings, the city council passed a resolution adopting the MND and attached mitigation monitoring program, and a resolution approving the housing project's tentative subdivision map (TSM).

Respondent and plaintiff Porterville Citizens for Responsible Hillside Development (PCRHD)[1] filed a petition for writ of mandamus, alleging violation of the California Environmental Quality Act (CEQA)[2] and the Subdivision Map Act (SMA) (Gov. Code, § 66410 et seq.).

Contour requested that judicial notice be taken of the EIR (environmental impact report) prepared for the 1990 amendment of the City's general plan (GPA EIR) and of an urgency ordinance concerning hillside development that was passed on the same date that the housing project was approved (Ordinance No. 1680).[3] Contour did not proffer any evidence that either of these documents had been consulted or utilized in preparation of the initial study or the MND. Contour also did not proffer any evidence that these documents were reviewed or considered by any city council member in connection with the decision to adopt the MND or approve the TSM. The request for judicial notice was not opposed and it can be reasonably inferred from the trial court's reference to these documents that it was granted.

After hearing, the trial court determined that substantial evidence supported a fair argument that the housing project may have several potentially significant adverse environmental effects. It issued a peremptory writ of mandamus that set aside the resolutions certifying the MND and approving the TSM. It ordered a "focused EIR or other appropriate CEQA analysis" addressing "aesthetics, density and grading/drainage/erosion" to be prepared.

---

[1] PCRHD is an association formed after approval of the housing project. Some members own homes that are located to the west of the housing project.

[2] CEQA is codified at Public Resources Code section 21000 et seq. Unless otherwise specified, all statutory references are to the Public Resources Code. CEQA is implemented in the CEQA Guidelines which are located at title 14 of the California Code of Regulations, section 15000 et seq. (Guidelines).

[3] Ordinance No. 1680 does not apply to the housing project. It has expired and been replaced by Ordinance No. 1692.

In this appeal, Contour challenges the trial court's determination that the record supports a fair argument that the housing project may have significant adverse environmental effects after mitigation and argues that the trial court impermissibly relied on the contents of the GPA EIR and Ordinance No. 1680 in making this determination. Contour also argues that the trial court should have permitted the City on remand to determine whether to adopt a tiered MND or to find that the housing project is entirely or partially exempt from CEQA.[4]

PCRHD defends the sufficiency of the evidence supporting a fair argument that the housing project may have significant adverse effect. Capitalizing on Contour's argument about the availability of an exemption or use of a tiered MND, PCRHD argues that City's failure to provide the notice of tiering that is required pursuant to CEQA Guidelines section 15152, subdivision (g) resulted in a prima facie CEQA violation. PCRHD also raises an SMA claim, a general plan consistency claim and a general plan adequacy claim.

As we will explain, Contour's request that judicial notice be taken of the GPA EIR and Ordinance No. 1680 has unnecessarily complicated the issues presented in this case. It is a fundamental CEQA precept that when assessing the adequacy of CEQA compliance, courts review the environmental documentation that actually was prepared and they assess the evidence that actually was utilized in preparation of the environmental documentation and presented to or considered by the decision makers when the challenged determination was made. The GPA EIR was not referenced in the CEQA documents that were prepared for the housing project or mentioned during either of the public hearings. The administrative record does not contain any documentary, declaratory or testimonial evidence indicating that the MND was tiered on the GPA EIR. Ordinance No. 1680 was enacted after Contour filed its application for the housing project and it does not directly apply to the housing project. Thus, the GPA EIR and Ordinance No. 1680 constitute extra-record evidence. As such, these documents are not admissible to challenge the substantiality of the evidence or to show that an agency has not proceeded in a manner required by law. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570–579 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Petroleum*).)

After assessing the administrative record that was before the city council when it adopted the MND and approved the TSM, we conclude that it does not contain substantial evidence supporting a fair argument that the housing project, as mitigated, may have adverse environmental impacts related to aesthetics, density or grading/drainage/erosion. The vague concerns about the housing project expressed by a few members of the public during the two

---

[4] City did not file an appearance in this court.

public hearings do not constitute substantial evidence supporting a fair argument, even when doubts are resolved in favor of EIR preparation.

Also, we conclude that PCRHD failed to exhaust its administrative remedies with respect to its prima facie CEQA violation claim, its general plan consistency claim and its general plan adequacy claims because these challenges were not presented to the City prior to adoption of the MND. Furthermore, PCRHD forfeited its SMA claim by failing to file any objections to the tentative statement of decision or otherwise alerting the trial court of its failure to expressly rule on this issue.

Therefore, we will reverse the judgment, vacate the peremptory writ of mandamus and deny the petition for writ of mandate.[5]

## FACTS

In early 2005, Contour submitted an application to the City for approval to develop a subdivision consisting of 230 single-family home sites on a 67-acre parcel that is zoned for low density residential use. Lot sizes in the housing project will vary between a minimum of 6,487 square feet and a maximum of 19,000 or 20,000 square feet, with an average size of 9,590 square feet.

The project site is a sloping hill with a grade varying from 1 percent to 15 percent. Historically, it has been used for agricultural purposes, mainly dry farming. There are no scenic vistas or scenic highways in the vicinity of the project site.

Rural residential uses are located to the north of the project site. The area to the west of the project site has a retention basin and a single-family residential subdivision. The area to the south is vacant and the area to the east has citrus trees and a hillside.

Community Development Director Bradley Dunlap prepared an environmental checklist form for the housing project (hereafter initial study). The initial study concluded that potential environmental factors relating to geological problems, water, air quality, utilities and service systems and aesthetics all could be mitigated to insignificance. It determined that an MND was appropriate for the housing project.

---

[5] Our determination that PCRHD did not meet its burden of demonstrating the existence of substantial evidence in the record supporting a fair argument that the housing project may have adverse environmental effects and our resultant reversal of the judgment and denial of the petition for writ of mandate renders moot Contour's contention that the City should have been granted discretion on remand to determine whether the housing project was exempt from CEQA in whole or in part and, if not exempt, to prepare a tiered MND.

The initial study concludes that the housing project is consistent with the land use and circulation elements of the general plan and the zoning ordinance. The housing project is compatible with existing land uses in the surrounding vicinity. The initial study states that "[d]evelopment of the subject site is expected to [be] commensurate to surrounding developed areas. No negative aesthetic effects will occur."

Because the project site is a hillside, slope stabilization to the satisfaction of the City engineer shall be installed prior to issuance of a certificate of occupancy for each residence. Grading must be performed in compliance with the approved conceptual grading plan on file with the City; variances require approval from the public works department and community development department. An erosion control plan and conformance with the City storm drain master plan will be required. "Depending on the soils report, an engineered foundation design would be required."

No member of the public submitted any written comments to the proposed MND. Two public agencies submitted written comments, both of which are irrelevant to the issues presented herein.

The first public hearing for adoption of the MND and approval of the TSM was held on July 5, 2005. At this hearing, seven members of the public spoke. While they expressed concerns about the housing project, none of them challenged the adequacy of the proposed mitigation measures or requested that an EIR be prepared. After Councilmember Irish and Mayor Pro Tem Hamilton stated that they would like to see pocket parks and trails added to the housing project, it was referred back to staff for further revision.

After discussions with the "Hillside/Eastside Committee" and various City officials, the housing project was revised, as follows: (1) a park and trail system for pedestrian and equestrian use was added; (2) a pocket park of .4 acres was added; and (3) the number of lots was reduced from 230 to 219, resulting in a density decrease from 3.41 lots to 3.25 lots per gross acre.

A second public hearing was conducted on September 6, 2005. One member of the public spoke.[6] Thereafter, the city council passed resolution 133-2005 adopting the MND and the attached mitigation monitoring plan and resolution 134-2005 approving the TSM.

---

[6] The contents of comments made by members of the public and council members at the two public hearings will be set forth as necessary in our discussion of appellate issues.

No environmental studies, petitions or other documents were submitted by any commenter prior to adoption of the MND.

On October 21, 2005, PCRHD filed an amended petition for writ of mandamus. The first cause of action alleged a violation of CEQA; the second cause of action alleged violation of the SMA (specifically Gov. Code, § 66474, subds. (c), (d)) and the Porterville Municipal Code. In its answer, Contour raised the failure to exhaust administrative remedies as an affirmative defense to both causes of action.

After hearing, a tentative statement of decision was filed ordering preparation of a focused EIR studying aesthetics, density and erosion/grading/drainage. City and Contour both filed objections to the tentative statement of decision. The court filed a ruling on submitted matter addressing their objections. Thereafter, it filed a judgment granting peremptory writ of mandate and it issued a peremptory writ of mandamus setting aside the resolutions adopting the MND and approving the TSM, and ordering preparation of a focused EIR.

City has circulated a notice of preparation for an EIR focused on the issues identified by the trial court. The EIR is not complete. A draft residential hillside ordinance has been written but it has not been adopted by the City.[7]

## DISCUSSION

I. *The GPA EIR and Ordinance No. 1680 are not part of the administrative record of the City's proceedings on the housing project. These documents constitute extra-record evidence that is not admissible to challenge the substantiality of the evidence supporting City's decision to adopt the MND, to show that City failed to proceed in a manner required by law, or to prove that the City intended to tier the MND on the GPA EIR.*

Contour requested judicial notice of the GPA EIR and Ordinance No. 1680. Contour's moving papers did not set forth the relevancy of these documents. However, Contour subsequently argued that the MND was tiered on the GPA EIR but that City failed to properly document this tiering in the initial study or the MND. Contour also argued that City should be able to proceed under a streamlined process (an exemption or a tiered MND) if the trial court found City's CEQA compliance to be deficient.

---

[7] PCRHD's request for judicial notice of the notice of preparation and the draft residential hillside ordinance is granted for the limited purpose of providing background information. (Evid. Code, § 459; Cal. Rules of Court, rule 8.252; *Petroleum, supra,* 9 Cal.4th at pp. 578–579.)

On appeal, Contour argues that the trial court erroneously used the contents of the GPA EIR and Ordinance No. 1680 in assessing whether the administrative record contains substantial evidence supporting a fair argument that the housing project may have adverse environmental effects. We agree. As will be explained, these documents constitute extra-record evidence that was not part of the administrative record before the City when it made the challenged decisions to adopt the MND and approve the TSM. Extrajudicial evidence may not be used to challenge the substantiality of the evidence supporting the City's adoption of the MND or to prove that the City failed to proceed in a manner required by law pursuant to section 21168.5. Furthermore, we have also concluded that Contour is foreclosed from using these documents to prove that the City meant to tier the MND on the GPA EIR but failed to reference this intention in any of the environmental documentation that was prepared for the housing project. (*Petroleum, supra*, 9 Cal.4th at pp. 570–579.)

> A. *The GPA EIR is extra-record evidence; the MND was not tiered on it.*

Contour argues that City intended to tier the MND on the GPA EIR and that this circumstance affects the appropriate standard of review and the remedy for CEQA noncompliance. As we will explain, there is no evidence whatsoever in the administrative record indicating that the MND was tiered on the GPA EIR. Furthermore, the record lacks any evidence indicating that the GPA EIR was utilized or consulted in the preparation of the initial study or the MND. Also, the GPA EIR was not referenced by any speaker during the public hearings and there is no evidence indicating that it was considered or consulted by any member of the city council prior to adoption of the MND. Thus, the GPA EIR constitutes extra-record evidence. As such, it is inadmissible for the following purposes: (1) to challenge the substantiality of the evidence supporting adoption of the MND; (2) to prove that the City failed to comply with CEQA's requirements; and (3) to prove that the City meant to tier the MND on the GPA EIR.

We begin with Contour's assertion that the MND was tiered on the GPA EIR but somehow City accidentally failed to document this tiering. If an MND is tiered on a prior EIR, Guidelines section 15152, subdivision (g), requires the MND to refer to the previous EIR and state where a copy of that document may be examined. Contour concedes that the MND does not comply with this requirement. The initial study does not refer to the GPA EIR and the MND does not contain any indication that it is tiered on the GPA EIR. The initial study contains a list of sources consulted. This list does not

include the GPA EIR.[8] Thus, the initial study does not indicate that the City used or considered the environmental analysis and conclusions that are contained in the GPA EIR in preparing the environmental documentation for the housing project. Similarly, the initial study does not state that it recommends adoption of an MND that is tiered on the GPA EIR. Also, the staff report in support of the MND makes no reference to the MND as being a tiered document. Finally, the resolution adopting the MND does not make any reference to it as a tiered document. Thus, there is no evidence in the record supporting Contour's tiering theory.

Contour asserts that the initial study contains two references to the use of earlier analyses. This is disingenuous. These references are contained within a printed form that is derived entirely from the appendix to the CEQA Guidelines. The form states that if an earlier analysis is used, it should be identified and should state where it is available for review. Neither was done here. The initial study does not contain an attachment containing relevant information about an earlier analysis. Thus, the references mentioned by Contour do not indicate that the initial study utilized the GPA EIR in preparing the initial study.

Contour's request for judicial notice did not include any declaratory or documentary evidence establishing that City intended to tier the MND on the GPA EIR or any evidence that City staff relied on the GPA EIR in preparing the initial study and/or MND. Also, Contour did not submit any evidence that members of the city council considered or consulted the GPA EIR in connection with the housing project. For example, Contour did not proffer a declaration authored by Community Development Director Bradley Dunlap averring that he considered or relied on the GPA EIR when preparing the initial study and MND. It did not proffer a declaration authored by any member of the city council stating that he or she considered the GPA EIR in connection with the housing project.[9]

---

[8] The list of consulted sources refers to various elements of the City's general plan and the City's zoning ordinance. These documents are part of the administrative record.

[9] We note that in City's written objections to the tentative decision it argued that an EIR should not be required because it had substantially complied with CEQA's requirements. During the course of this argument, City asserted, without elaboration, that it "relied on the [GPA EIR]." However, City proffered no evidence supporting this factual assertion. It is axiomatic that the arguments of counsel are not evidence. Section 21080, subdivision (e)(2), specifies that substantial evidence is not "argument, speculation, unsubstantiated opinion or narrative."

Thus, the GPA EIR is not part of the administrative record of the proceedings before the City when it adopted the challenged resolutions.

### B. *Ordinance No. 1680 is extra-record evidence.*

Ordinance No. 1680 is urgency legislation that was approved at the same meeting in which the MND was adopted and the TSM approved. However, it does not apply to the housing project because it was approved after Contour filed its application to develop the housing project. Obviously, there are no references to Ordinance No. 1680 in the initial study, the staff report prepared for the MND or the MND. Contour's request for judicial notice did not include any declaratory or documentary evidence establishing that City considered Ordinance No. 1680 in connection with the housing project. Furthermore, Ordinance No. 1680 has expired. Thus, Ordinance No. 1680 also is not part of the record of the proceedings before the City when it passed the challenged resolutions.

### C. *Extra-record evidence is not admissible for the purpose of challenging the substantiality of the evidence supporting City's decision to adopt the MND or to show that City failed to proceed in a manner required by law.*

■ *Petroleum, supra,* 9 Cal.4th 559, set forth the controlling legal principle: "[J]ust as appellate courts generally may not consider evidence not contained in the trial record when reviewing such findings, courts generally may not consider evidence not contained in the administrative record when reviewing the substantiality of the evidence supporting a quasi-legislative administrative decision under Public Resources Code section 21168.5. We also conclude that extra-record evidence is generally not admissible to show that an agency 'has not proceeded in a manner required by law' in making a quasi-legislative decision. Such evidence is generally not admissible to challenge quasi-legislative decisions on non-CEQA grounds, and we see no reason to apply a different rule in CEQA cases." (*Petroleum, supra,* 9 Cal.4th at p. 565.)

Extra-record evidence is admissible to provide background information and, under unusual circumstances, may be admissible for unspecified limited purposes. (*Petroleum, supra,* 9 Cal.4th at p. 579.) However, "extra-record evidence can never be admitted merely to contradict the evidence the administrative agency relied on in making a quasi-legislative decision or to raise a question regarding the wisdom of that decision." (*Ibid.*)

Our high court provided a trifold rationale supporting its conclusion that extra-record evidence is not admissible when considering a challenge to the substantiality of evidence supporting a quasi-legislative determination under CEQA. First, the Legislature elected to use the words "substantial evidence" in section 21168.5. "In other parts of CEQA the Legislature has expressly stated that the existence of substantial evidence depends solely on the record before the administrative agency." (*Petroleum, supra,* 9 Cal.4th at p. 571.) Second, excessive judicial interference with the administrative agency's quasi-legislative actions would conflict with the well-settled principle that the legislative branch is entitled to deference from the courts because of the constitutional separation of powers. Finally, courts have regularly given a high degree of deference to the regulatory decisions made by administrative agencies in recognition of their expertise in the specified area. (*Id.* at pp. 571–573.)

The court also offered a trio of reasons supporting its conclusion that extra-record evidence is not admissible to show that an administrative agency failed to proceed in a manner required by law within the meaning of section 21168.5. First, "It is well settled that extra-record evidence is generally not admissible in non-CEQA traditional mandamus actions challenging quasi-legislative administrative decisions." (*Petroleum, supra,* 9 Cal.4th at p. 574.) The high court found "no sound reason why CEQA and non-CEQA cases should be governed by different evidentiary rules." (*Ibid.*) Second, the administrative record developed during the quasi-legislative process is usually adequate to allow the courts to review a challenged decision without recourse to extra-record evidence. (*Id.* at p. 575.) Finally, "if interested parties know they will not be able to introduce extra-record evidence in subsequent judicial proceedings, they will present all their evidence to the administrative agency in the first instance." (*Ibid.*)

Numerous appellate courts applied this legal principle in CEQA cases prior to the *Petroleum* decision. In *Markley v. City Council* (1982) 131 Cal.App.3d 656 [182 Cal.Rptr. 659], the appellate court refused to consider evidence outside the administrative record that petitioner was misled by developers about the nature of the project. (*Id.* at pp. 661–664.) And in *Browning-Ferris Industries v. City Council* (1986) 181 Cal.App.3d 852 [226 Cal.Rptr. 575], declarations by city staff, an expert's report and a transcript of a hearing conducted by a separate agency were not admissible in an action challenging an EIR because they were not part of the proceedings of the agency that certified the EIR. (*Id.* at p. 861.) In *Schaeffer Land Trust v. San Jose City Council* (1989) 215 Cal.App.3d 612 [263 Cal.Rptr. 813], a declaration supporting a traffic analysis was not admissible in an administrative mandamus case reviewing CEQA compliance for amendments to a land use plan. (*Id.* at pp. 624–625, fn. 9.) These cases all support our conclusion that the GPA EIR constitutes extra-record evidence that is not admissible when

considering the substantiality of evidence or determining whether City proceeded in the manner required by law.

Similarly, in *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011 [280 Cal.Rptr. 478], the appellate court concluded that a postdecision supplemental EIR should not have been admitted by the trial court because it was not before the decision makers when they rendered their decision on the project. (*Id.* at p. 1032, fn. 13.) And *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229 [227 Cal.Rptr. 899] upheld the trial court's refusal to admit a subsequent EIR into evidence in a challenge to an earlier EIR. (*Id.* at p. 249, fn. 11.) Ordinance No. 1680 is analogous to a supplemental or subsequent EIR because it was passed after Contour filed its application to build the housing project.

The trial court's consideration of the general plan EIR and Ordinance No. 1680 does not bind this court to accept these documents as part of the administrative record because, as will be explained in discussion part II.A., the decision whether CEQA requires preparation of an EIR presents a question of law and we do not defer to the agency's or the trial court's determinations on this issue. (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928 [21 Cal.Rptr.3d 791] (*Pocket Protectors*); *Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 151 [39 Cal.Rptr.2d 54] (*Stanislaus*).)

Accordingly, we conclude that the GPA EIR and Ordinance No. 1680 constitute extra-record evidence. We agree with Contour that it is improper to consider these documents in determining whether the record contains substantial evidence supporting a fair argument that the housing project may have adverse environmental effects. Furthermore, GPA EIR and Ordinance No. 1680 are not admissible to support PCRHD's claim that City failed to proceed in a manner required by law by not complying with CEQA Guidelines section 15152, subdivision (g). (*Petroleum, supra,* 9 Cal.4th at pp. 571–579.)

> D. *Extra-record evidence is not admissible to support Contour's assertion that City meant to prepare a tiered MND.*

Our determination that the GPA EIR and Ordinance No. 1680 constitute extra-record evidence has implications that extend beyond those recognized by Contour. The GPA EIR is not admissible to support Contour's assertion that the City meant to tier the MND on the GPA EIR. That the City theoretically might have been able to use the GPA EIR to prepare a tiered

MND or to find the housing project exempt from CEQA, in whole or in part, is not relevant when assessing City's actual CEQA compliance. The environmental documentation that actually was prepared for the housing project is controlling and Contour is limited to the administrative record that actually was before the City when it approved the MND. If Contour or PCRHD believed that the City attempted to tier the MND on the GPA EIR but failed to comply with CEQA's notice requirements, it was incumbent on Contour or PCRHD to raise this point prior to City's adoption of the MND. (§ 21177, subd. (a).)

As previously explained, there is no indication in the record of the administrative proceedings supporting Contour's theory that the City meant to prepare a tiered MND but somehow completely failed to express this intention in the environmental documentation that was prepared for the housing project. This determination dooms Contour's contention that the real question before this court "is whether or not substantial evidence supports a determination that the [housing project] was either the same as, or within the scope of the [GPA EIR]." The "substantial evidence-abuse of discretion test" that is applied when reviewing an agency's decision not to require a subsequent EIR for a project that is within the scope of a previously certified program or project EIR has no application to this case.

II. *The administrative record before the City when it adopted the MND does not contain substantial evidence supporting a fair argument that the housing project may have significant adverse effects on aesthetics, density or grading/drainage/erosion after mitigation.*

A. *The applicable standard of review is the deferential fair argument test.*

" '. . . CEQA requires the preparation of an EIR "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." [Citations.] Thus, if substantial evidence in the record supports a "fair argument" significant impacts or effects may occur, an EIR is required and a negative declaration cannot be certified.' [Citation.]" (*Stanislaus, supra*, 33 Cal.App.4th 144, 150.) The petitioner bears the burden of proof " 'to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact.' [Citation.]" (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1379 [43 Cal.Rptr.2d 170] (*Gentry*).)

In *Stanislaus*, this court explained the applicable standard of appellate review: "When a challenge is brought to an agency's determination an EIR is not required, 'the reviewing court's "function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made." ' [Citation.] The 'fair argument' test is derived from Public Resources Code section 21151. This section 'creates a low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted.' [Citation.] 'If there is substantial evidence of a significant environmental impact, evidence to the contrary does not dispense with the need for an EIR when it still can be "fairly argued" that the project may have a significant impact.' [Citations.] However, contrary evidence is considered in assessing the weight of the evidence supporting the asserted environmental impact. [Citation.]" (*Stanislaus, supra*, 33 Cal.App.4th at pp. 150–151.)

Application of the fair argument standard of review presents a question of law, not fact, and we do not defer to the agency's or the trial court's determinations on this issue. (*Pocket Protectors, supra*, 124 Cal.App.4th at p. 928.) "Rather, we independently 'review the record and determine whether there is substantial evidence in support of a fair argument [the proposed project] may have a significant environmental impact, while giving [the lead agency] the benefit of a doubt on any legitimate, disputed issues of credibility.' [Citations.]" (*Stanislaus, supra*, 33 Cal.App.4th at p. 151.)

The definition of "substantial evidence" is codified in section 21080, subdivision (e). "[S]ubstantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (§ 21080, subd. (e)(1); see also CEQA Guidelines, § 15384, subd. (b).) It "is not argument, speculation, unsubstantiated opinion or narrative . . . ." (§ 21080, subd. (e)(2); see also CEQA Guidelines, § 15384, subd. (a).) Mere uncorroborated opinion or rumor does not constitute substantial evidence. In relevant part, CEQA Guidelines section 15384 provides: " 'Substantial evidence' . . . means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency . . . ." (CEQA Guidelines, § 15384, subd. (a).)

■ "Under CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons." (*Mira Mar Mobile Community v. City of Oceanside* (2004) 119 Cal.App.4th 477, 492 [14 Cal.Rptr.3d 308] (*Mira Mar*).) Thus, "the mere

possibility of adverse impact on a few people, as opposed to the environment in general," is not sufficient to constitute substantial evidence of an adverse effect. (*Pocket Protectors, supra*, 124 Cal.App.4th at p. 929.)

An agency may rely on the expertise of its planning staff in determining whether a project will not have a significant impact on the environment. (See, e.g., *Gentry, supra*, 36 Cal.App.4th at p. 1380.) Unsubstantiated fears and desires of project opponents do not constitute substantial evidence. (*Perley v. Board of Supervisors* (1982) 137 Cal.App.3d 424, 436–437 [187 Cal.Rptr. 53].) "[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence." (*Gentry, supra*, 36 Cal.App.4th at p. 1417.)

> B. *The record does not contain substantial evidence supporting a fair argument that the housing project may have an adverse effect on aesthetics.*

> i. *Facts*

As previously stated, no environmental studies, petitions, photographs, or other exhibits were submitted by any commenter prior to adoption of the MND.

We have reviewed the record of the public hearings. Only two speakers, Jennifer Lindgren and Tony Sung, made remarks that are relevant to the issue of aesthetics. Lindgren and Sung live in a subdivision named Jasmine Ranch that is located to the west of the housing project.

Lindgren spoke twice during the first public hearing. She stated that she would like to see a master planned development on the east side of the City. She said that the east side of the City is a "very pleasant area out there." It is "a very desirable area to live, and I do want to see that it is kept that way." She also stated, in relevant part: "We have beautiful hills in Porterville. Not every community in Tulare County or in this area of California, has these hills, and in Porterville they have always been a very preferable place to live. We have Scenic Heights, we have Corona by the golf course, and we have Crestview, we have Jasmine Ranch, and in Exeter, you see Badger Hill, and I would like to see less dense building in these areas that would preserve, really the beauty of the area."

Tony Sung characterized Jasmine Ranch as the "only high end area with a mountain view in Porterville."

> ii. *The record does not contain substantial evidence supporting a fair argument that the housing project may cause a significant adverse effect on aesthetics.*

█ "Under CEQA, the question is whether a project will affect the environment of persons in general, not whether a project will affect particular persons. [Citation.]" (*Mira Mar, supra,* 119 Cal.App.4th at p. 492; see also *Pocket Protectors, supra,* 124 Cal.App.4th at p. 929.) Furthermore, "California landowners do not have a right of access to air, light and view over adjoining property. [Citation.]" (*Mira Mar, supra,* 119 Cal.App.4th at p. 492.)

It is important to recognize that there is no evidence that the housing project will impact any public views, vistas or scenic highways. "That a project affects only a few private views may be a factor in determining whether the impact is significant." (*Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 402 [10 Cal.Rptr.3d 451] (*Ocean View*).) The initial study states that there are no scenic views or vistas located in the project vicinity. There is no evidence in the record contradicting this determination. Also, the record does not contain any evidence indicating that the housing project is near any public gardens, parks or trails. In fact, Lindgren and Sung did not directly state that the housing project would adversely impact their current views. They merely stated that the area in which they live is desirable because it has a mountain view and they were concerned that a high density project would adversely affect the overall aesthetics of the area.

*Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720 [3 Cal.Rptr.2d 488] is instructive. There, the court determined that height, view and privacy objections raised by appellant to construction of a single-family dwelling on a lot did not raise a fair argument of a reasonable possibility that the project would have a significant effect on the environment due to unusual circumstances. The court explained that "we must differentiate between adverse impacts upon particular persons and adverse impacts upon the environment of persons in general." (*Id.* at p. 734.) It determined that there was no evidence that construction of the proposed dwelling "would adversely affect the environment of persons in general. Moreover, the height, view and privacy objections . . . impacted only a few of the neighbors and were properly considered by City in connection with its site development

permit approval, along with other aesthetic concerns. These concerns did not affect the environment of persons generally and did not result from 'unusual circumstances.' " (*Ibid.*)

■ The absence of evidence of adverse impact on a public view, park or trail is significant; it distinguishes the instant case from *Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597 [35 Cal.Rptr.2d 470] (EIR required where project could affect a public park's unobstructed view of Pacific Ocean) and *Ocean View, supra*, 116 Cal.App.4th 396 (EIR required where record contained photographic evidence that a large aluminum reservoir cover would be visible from public trails as well as private homes).

Furthermore, only Lindgren and Sung even raised the possibility of adverse aesthetic impacts and their concerns are vague and unsupported by a specific factual basis or any photographic evidence. In *Ocean View*, the court cautioned, "[i]f it were merely the matter of expressions of concern by one or two people, we might agree that there is no substantial evidence of a negative impact" on aesthetics arising from covering the reservoir. (*Ocean View, supra*, 116 Cal.App.4th at p. 403.) However, "[t]he evidence here goes beyond a few people expressing concern about the aesthetics of the project," and included substantial evidence that the cover would be visible from both private and public view areas. (*Ibid.*) This case stands in sharp contrast to *Ocean View*. Here, the record contains nothing but "expressions of concern by one or two people" about a possible impact on the overall aesthetics of the local area resulting from approval of a housing subdivision that has a slightly higher density than the subdivision in which they live. These vague complaints do not rise to the level of substantial evidence supporting a fair argument that the housing project may have a significant adverse aesthetic impact.

■ We mention that a few speakers expressed concern that the housing project would not be of commensurate quality as their homes and, consequently, the housing project could lower their property values. CEQA is not an economic protection statute. Landowners surrounding a proposed project site do not state a valid CEQA concern when they express fears that the proposed project could adversely affect their property value. (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1205 [22 Cal.Rptr.3d 203] (*BCLC*); CEQA Guidelines, § 15131, subd. (a).) Furthermore, the initial study states that the housing project will be commensurate to surrounding developed areas.

Therefore, we conclude PCRHD failed to satisfy its burden of demonstrating the existence of substantial evidence in the record supporting a fair argument of a significant adverse effect on aesthetics.

    C.   *The record does not contain substantial evidence supporting a fair argument of a density-related adverse environmental effect.*

    i.  *Facts*

At the first public hearing, four speakers made comments related to the density of the housing project.

Lindgren stated that she was "concerned about maybe a maximum build-out out there of maybe lower quality homes. Quality is one of the concerns, and also the density of homes on the map."

Sung stated: "I support . . . the development of . . . Porterville, in the [East side] of the town, especially. You know, we need to grow, but, you know, it is not for something like, someone like to maximize the usage of the 67 acres, it looks like they maybe only ever meet the (inaudible) of 6,000 square foot of each lot, compared to the neighborhood we have right here in Jasmine Ranch, and Crestview, we are at least a minimum 12,000 square foot lot, and some houses over there in Crestview is like over 4,000 or 5,000 square foot. And, we have one new construction over there in Jasmine Ranch. It is over 5,000 square foot with over one-half million house. It look[s] like the map, you [are] going to have like 230 homes, so that maybe someone trying to just like maximize the usage of the lots . . . . I would recommend the developers [have] to be look[ing] at the reference around the neighbors, before they decide how they are going to develop the 67 acre lots . . . . That would bring a lot of kids, you know, a lot of traffic, too many traffic, a lot of walkways, and I don't recommend, you know, they going to build 230 homes over there in 67 acres. I fully recommend they should be redesigned, how should they develop that 67 acres. . . ."

Karen Torres said, "the fact that you're putting so many homes, you know, wanting to put so many homes next to a large, very nice property area is, we're very concerned. . . . I am concerned what quality is going to go in there for my property values. . . . [I]f the idea is to put in a lower quality of homes, then we're hurting our property values, plus the environment of what out there."

Dorothy Broome stated that "it looks like there are at least the 64 plus acres . . . . [¶] . . . [That is] a lot of acres, and that's a lot of houses, and I would like to have the public sort of, get a little more educated on this stuff."

The housing project's density is consistent with the general plan and the zoning ordinance. The initial study determined that "[t]he proposed project will allow for development as supported by the General Plan and Zoning Ordinance." The initial study concluded that the housing project is expected to be commensurate to surrounding developed areas. It also concluded that the housing project will be compatible with existing land uses in the surrounding vicinity.

The lot sizes in the housing project will vary between a minimum of 6,487 square feet and a maximum of 19,000 or 20,000 square feet, with an average size of 9,590 square feet. Over 46 percent of the lots in the housing project exceed 10,000 square feet.

The only evidence concerning the density of the nearby subdivision, Jasmine Ranch, is contained in Sung's statement. He said that the minimum lot size in Jasmine Ranch is 12,000 square feet. There is no evidence in the record specifying the number of home sites in Jasmine Ranch. Lindgren stated that the Jasmine Ranch subdivision will have three phases, but only phase one is partially complete.

ii. *The record does not support a fair argument of a density-related significant adverse effect.*

As background information, we mention that California law affords extra protection to housing density that is consistent with the applicable general plan and zoning ordinance. To require reduction of density below that permitted by the general plan and zoning ordinance as a condition of approval for a housing project that is affordable to low or moderate income households, the lead agency must make specific findings set forth in subdivision (d) of Government Code section 65589.5.

We agree with Contour that the concerns expressed by Lindgren, Torres and Sung are focused upon the possibility that the minimum lot size of the home sites in the housing project could adversely affect their property values. Other than Sung's comment that 230 homes would bring a large number of schoolchildren into the area and increase traffic, the comments do not correlate the density concerns to any specific adverse environmental impact. The speakers' concerns clearly revolved about their assumption that a housing subdivision with smaller lot sizes would reduce their property values. Unsubstantiated fears about potential economic effects resulting from a

proposed project are not environmental impacts that may be considered under CEQA. (*BCLC, supra*, 124 Cal.App.4th at p. 1205; CEQA Guidelines, § 15131, subd. (a).)

This is not a case where a zoning variance is being requested to construct a large project consisting of high density apartments, townhomes or condominiums in an area populated exclusively by single-family residences located on two-acre parcels. Jasmine Ranch apparently has a 12,000 square foot minimum lot size. Although the housing project's minimum lot size is less than 7,000 square feet, the lot sizes range up to 20,000 square feet; over 46 percent of the lot sizes exceed 10,000 square feet. The difference in the lot sizes between these two subdivisions is not so great that it raises a reasonable possibility that the housing project is inconsistent with the density of surrounding development.

Also, there is no record evidence indicating that the existing infrastructure (such as roads and sewer service) and schools have insufficient capacity to absorb the population growth resulting from the housing project. Sung did not set forth any facts indicating that local roads and schools are overcrowded. He merely stated that the housing project would bring a lot of children and traffic into the area. "[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence." (*Gentry, supra*, 36 Cal.App.4th at p. 1417.)

Accordingly, we conclude that PCRHD failed to satisfy its burden of demonstrating the existence of substantial evidence in the record supporting a fair argument of a density-related adverse environmental impact.

D. *The record does not contain substantial evidence supporting a fair argument that the housing project, as mitigated, may have any significant adverse effects related to grading/drainage/erosion.*

i. *Facts.*

Approval of the housing project was conditioned upon several requirements related to grading, erosion and flooding. Contour was required to have a civil engineer prepare a concept grading plan. The City engineer and staff reviewed and approved this grading plan. Contour must follow the approved grading plan and any variances from this plan require approval from the public works department and community development department. An erosion control plan and conformance with the city storm drain master plan was required. "Depending on the soils report, an engineered foundation design would be required." Contour must prepare a storm water pollution

prevention plan for the construction phase of the housing project. Contour must construct all drainage facilities that the City engineer determines are necessary to comply with the City's storm drain master plan. The City required Contour to prove slope stabilization to the satisfaction of the City engineer prior to issuance of a certificate of occupancy for each residence.

Torres made a remark at the first hearing touching on the issues of grading and soil. She stated that "all of our homes are custom built. It took a lot of extra excavation to remove soil and replace it so there wouldn't be cracked foundations. And that soil is no different, it is just, you know, across the street. Because if someone does come in who doesn't understand that soil and does not take those precautions, then our property values are going to go down."

Dick Eckhoff was the only private individual who spoke at the second hearing. He stated that he had "questions or concerns . . . mainly with storm drainage and with usable lot size." Eckhoff was concerned that the planned 18-inch storm drain may be inadequate to account for occasional heavy rains. He was also concerned about the expense of landscaping a sloping lot and he commented that there is not "a whole lot of usable space on the some of these [lots]." Also, he wondered whether staff was overly optimistic in concluding that the risk of landslides or flooding was less than significant after mitigation. Finally, he was concerned that individual homeowners in the future could remove all the vegetation on their lot, thereby eliminating the soil stabilizing effect provided by such vegetation. Eckhoff did not state that he possessed any expertise in civil engineering or directly comment on the adequacy of the conditions of approval for the housing project.

Immediately before asking for a motion to approve the resolution adopting the MND, Mayor West made the following remark: "I'm like Mr. Eckhoff—the drainage and these retaining walls—unsightly with those retaining walls (inaudible) and the drainage is a big concern where those lots are very steep. That would be my two concerns."

> ii. *The record does not support a fair argument that the housing project, as mitigated, may have any significant adverse effects related to grading/drainage/erosion.*

An agency may rely on the expertise of its planning staff in determining whether a project will not have a significant impact on the environment. (*Gentry, supra*, 36 Cal.App.4th at pp. 1379–1380.) While relevant personal observations on nontechnical subjects may qualify as substantial evidence for a fair argument (*Pocket Protectors, supra*, 124 Cal.App.4th at p. 928), questions surrounding grading, drainage and soil erosion are highly technical.

"[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence." (*Gentry, supra,* 36 Cal.App.4th at p. 1417.)

Here, neither Eckhoff nor Torres stated that they possessed any expertise in civil engineering or a related field. Eckhoff did not provide any factual evidence contradicting the conclusions of City staff that the mitigation measures relating to grading, soil testing, erosion control, slope stabilization and storm drainage would be adequate to protect against related adverse environmental impacts. Torres did not offer any factual information indicating that the conceptual grading plan approved by the City was inadequate to protect against such a possibility. Her concern about proper grading and excavation focused on the possibility that her property value could be reduced. Mayor West only stated that he shared concerns about proper drainage and unsightliness of retaining walls. He did not provide any factual information or opine that the mitigation measures required for the housing project may be inadequate to preclude adverse environmental effects relating to erosion or draining.

In the absence of demonstrated expertise in civil engineering or specific factual testimony about the inadequacy of mitigation measures, the general concerns expressed by Torres, Eckhoff and Mayor West do not rise to the level of substantial evidence of a potentially significant environmental effect. Their comments are properly characterized as unsubstantiated opinion. As such, they do not constitute substantial evidence supporting a fair argument. (*Pocket Protectors, supra,* 124 Cal.App.4th at pp. 928–929.) Given the absence of substantive, fact-based testimony by an individual demonstrating that he or she possessed any expertise in these highly technical areas, the City properly relied on the conclusions of its staff that the mitigation measures imposed on the housing project were sufficient to avoid any adverse consequences resulting from improper grading, inadequate soil stabilization or insufficient storm drainage.

PCRHD does not mention the testimony received during the two public hearings. Rather, it argues that a portion of the housing project exceeds a 10 percent slope and the City's general plan requires " 'contour grading, stacking, and clustering' " of the portions of the project site exceeding the 10 percent standard. This argument fails because it is a disguised challenge to the determination that the housing project and the TSM are consistent with the general plan. As will be explained, *post,* in part III, a challenge to the City's finding that the housing project is consistent with the general plan was not raised by anyone prior to adoption of the MND. Eckhoff's general remarks about grading did not alert the City of a possible challenge to the consistency of the TSM with chapter 4, section 3.0, of the City's general

plan. A challenge to the consistency of the general plan with the TSM may not be raised for the first time in the trial court. PCRHD also cites the findings supporting Ordinance No. 1680 and the contents of the general plan EIR. As previously explained, these documents are extra-record evidence and are inadmissible to challenge the substantiality of the evidence supporting the City's findings and determinations.

██  For all of these reasons, we conclude that PCRHD failed to satisfy its burden of demonstrating the existence of substantial evidence in the record supporting a fair argument that, as mitigated, the housing project may cause any adverse environmental impacts related to grading, drainage or erosion.

III.  *PCRHD's prima facie CEQA violation claim and its general plan consistency and adequacy claims are not cognizable because these issues were not presented to the City prior to adoption of the MND and approval of the TSM.*

PCRHD contends that the City's failure to comply with CEQA Guidelines section 15152, subdivision (g), resulted in a prima facie CEQA violation. PCRHD also raises general plan consistency and adequacy claims. No objection to project approval for any of these reasons was presented prior to adoption of the MND. No speaker asserted that the City intended to tier the MND on the GPA EIR but failed to comply with CEQA's notice provisions (CEQA Guidelines, § 15152, subd. (g)). Neither possible inconsistency of the housing project with any element of the City's general plan nor possible inadequacy of the general plan itself was raised by any speaker at the public hearings. None of these issues were referenced during the public hearings or in the two comment letters.

██  With certain exceptions not shown to be relevant in this case, CEQA prohibits a petitioner or appellant from alleging noncompliance with the requirements of CEQA unless the alleged grounds for noncompliance were presented to the public agency either orally or in writing by any person during the public comment period or during the hearing on project approval. (§ 21177, subd. (a); *BCLC, supra,* 124 Cal.App.4th at p. 1199.) When a ground of noncompliance with CEQA was not raised during the comment period or during the public hearing on project approval, the right to raise the issue in a subsequent legal action is waived. The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1136 [27 Cal.Rptr.3d 675].) "[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them." (*Id.* at p. 1140.) This requirement is known as the exhaustion doctrine. (2 Kostka & Zischke, Practice Under the Cal.

Environmental Quality Act (Cont.Ed.Bar 2006) Judicial Review, § 23.93, p. 1228.) The rationale behind this rule is that the public agency should have the opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review. (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1198 [200 Cal.Rptr. 855].)

We have reviewed the comments made during the two public hearings. Even giving them a generous interpretation, these grounds of CEQA noncompliance were not presented to the City and it did not have an opportunity to evaluate and respond to these alleged grounds of noncompliance. "General objections to project approval or general references to environmental issues are not sufficient." (2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra*, § 23.94, p. 1229; see *Coalition for Student Action v. City of Fullerton, supra*, 153 Cal.App.3d at pp. 1197–1198.)

There is no basis in law or equity to relieve PCRHD from compliance with the exhaustion doctrine. The initial study concluded that the housing project was consistent with the general plan and the zoning ordinance. Both of these documents were included in the initial study's list of consulted sources. Therefore, issues related to general plan consistency and adequacy could have been presented to the City prior to adoption of the MND and approval of the TSM. As we have explained, the record does not support the assertion that the MND was tiered on the GPA EIR. If PCRHD and/or Contour believed City should have tiered the MND on the GPA EIR or thought that City had actually done so but failed to properly document this tiering or comply with CEQA Guidelines section 15152, subdivision (g), it was incumbent on them to present this point to the City prior to adoption of the MND. Contour raised PCRHD's failure to exhaust administrative remedies as an affirmative defense. Contour's request for judicial notice of the GPA EIR did not operate as a de facto waiver of this defense.

Thus, PCRHD's general plan consistency and adequacy claims and its prima facie CEQA violation claim are not cognizable because PCRHD failed to exhaust its administrative remedies on these issues. "[H]aving failed to raise their CEQA clams at the administrative level, [PCRHD] cannot air them for the first time in the courts." (*Coalition for Student Action v. City of Fullerton, supra*, 153 Cal.App.3d at p. 1198; see *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 282 [42 Cal.Rptr.3d 537].)

IV. *PCRHD forfeited its SMA claim by failing to object to the tentative statement of decision or to otherwise alert the trial court of its failure to expressly rule on this issue.*

PCRHD's second cause of action alleged a violation of the SMA and the Porterville Municipal Code. This cause of action was not directly addressed in the tentative statement of decision, the ruling on submitted matter, the judgment or the peremptory writ. PCRHD did not file any objections to the tentative statement of decision or otherwise alert the trial court to its failure to expressly rule on this cause of action.

In its responsive brief, PCRHD asserts that the trial court did not address the SMA claim and argues that the matter should be remanded to the trial court with directions to grant the amended petition and to order the City to reconsider its SMA claim, as follows: "Due to the Trial Court's determination that the City had failed to proceed in the manner required by law under CEQA, *the Court did not proceed to review or address [PCRHD's] claims under the [SMA]*, which do not require exhaustion, due to the failure to publish the notice required by law under the SMA. [(Gov. Code, § 65009, subd. (b)(1), (2).)]" (Italics added.)

Pursuant to Government Code section 68081, the parties filed supplemental briefing addressing whether PCRHD waived its SMA claim by failing to press for a ruling below. In its letter brief, PCRHD advanced a radically different position from that expressed in its original briefing. It asserts that the trial court actually ruled in its favor on the SMA claim and therefore the portion of the judgment setting aside the resolution approving the TSM should be affirmed. In relevant part, PCRHD writes: "Given the fact that the language of the Judgment expressly ordered the City to set aside [the resolution approving the TSM], *Respondent's counsel reasonably believed that the Court had addressed and decided the issues concerning the City's violation of the SMA* and that the Trial Court had fully adjudicated the issues before it, including the issue regarding the invalidity of the SMA approval of the [TSM]." (Italics added.)

It is difficult to give credence to either of PCRHD's arguments because of the contradictory factual assertions quoted above. However, it is unnecessary to further pursue this line of thought because both of the positions that have been asserted by PCRHD lack merit. As we will explain, the trial court impliedly rejected the SMA claim and PCRHD forfeited appellate consideration thereof by failing to object to the tentative decision.

All presumptions are drawn in favor of the judgment and we assume the court made whatever findings are necessary to support it. (*In re Marriage of*

*Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227] (*Arceneaux*); *Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 140 [80 Cal.Rptr.2d 126].) In this case, application of this principle results in an inference that the trial court rejected the SMA claim because it did not order any relief based thereon or require City to perform any further acts to comply with the SMA. The trial court's finding in PCRHD's favor on the CEQA cause of action does not support an implied conclusion that it found the TSM cause of action meritorious; the two claims are independent. The remedy provided in the peremptory writ does not reference provision of any notice required under the SMA or otherwise indicate that City is required to undertake any actions to comply with the SMA; the peremptory writ refers only to deficiencies in CEQA compliance and additional actions required to comply with CEQA. Thus, the trial court did not impliedly rule in PCRHD's favor on the SMA claim when it determined that a focused EIR was required or when it set aside the resolutions adopting the MND and approving the TSM.

It is axiomatic that a party may not complain on appeal of rulings to which it acquiesced in the lower court. (*Cushman v. Cushman* (1960) 178 Cal.App.2d 492, 498 [3 Cal.Rptr. 24].) " '[F]orfeiture' is the correct legal term to describe the loss of the right to raise an issue on appeal due to the failure to pursue it in the trial court." (*In re Stier* (2007) 152 Cal.App.4th 63, 74 [61 Cal.Rptr.3d 181] (*Stier*).) It is unfair to the trial judge and the adverse party to attempt to take advantage of an alleged error or omission on appeal when the error or omission could have been, but was not, brought to the attention of the trial court in the first instance. (*Id.* at p. 75.) As explained in *Stier*: " ' "The parties must call the court's attention to issues they deem relevant. ' "In the hurry of the trial many things may be, and are, overlooked which could readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them." ' " ' [Citation.]" (*Stier, supra*, 152 Cal.App.4th at p. 75.)

It follows that when a trial court announces a tentative decision, a party who failed to bring any deficiencies or omissions therein to the trial court's attention forfeits the right to raise such defects or omissions on appeal. (*Arceneaux, supra*, 51 Cal.3d at pp. 1133–1134; see also *Rees v. Department of Real Estate* (1977) 76 Cal.App.3d 286, 291 [142 Cal.Rptr. 789].)

Accordingly, we conclude that PCRHD forfeited its SMA claim because it did not file any objections to the tentative statement of decision or otherwise bring the trial court's attention to its failure to expressly rule on the SMA issue.

## DISPOSITION

The judgment is reversed. The superior court is directed to vacate the order granting the peremptory writ of mandate and to enter an order denying the petition for writ of mandate. Costs on appeal are awarded to Contour.

Cornell, J., and Hill, J., concurred.

The petition of plaintiff and respondent for review by the Supreme Court was denied March 12, 2008, S160006. Moreno, J., did not participate therein.