Filed 5/1/18; Certified for Publication 5/24/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHARLES T. JENSEN et al., Plaintiffs and Appellants, v. CITY OF SANTA ROSA, Defendant and Respondent; SOCIAL ADVOCATES FOR YOUTH, Real Party in Interest and Respondent. | A144782 (Sonoma County Super. Ct. No. SCV255347) |

This case arises from the City of Santa Rosa's (City) decision to turn a 69-bed defunct hospital into a facility called the Dream Center (sometimes "Project"), which would house 63 young adults, ages 18 to 24, and would provide individual and family counseling, education and job training, a health and wellness center serving the community for ages 5 through 24, and activities for residents, including a pottery throwing area, a half-court basketball area, and a garden to be tended by the residents. The Dream Center was sponsored and largely funded by real party in interest, Social Advocates for Youth (SAY).[1] Two neighbors, Charles T. Jensen and Robert Turley (appellants), challenged the Project under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) on the grounds that, among other things,

---

[1] SAY and the City have filed a joint respondents' brief. Points made in that brief will be referred to as the City's arguments, though also made on behalf of SAY.

1

noise impacts from the Project required preparation of an environmental impact report (EIR). The City instead issued a negative declaration signifying its conclusion that the Project would not have a significant environmental effect and an EIR would not be required. Appellants filed a petition for writ of administrative mandate (Code Civ. Proc., § 1094.5) in superior court, where the City's decision was upheld and the requested writ denied. This appeal followed.

On appeal, the appellants focus on two specific sources of noise they claim required preparation of an EIR: traffic noise from the south parking lot adjacent to the Dream Center, and noise from the residents' outdoor recreational activities. We conclude there is no substantial evidence supporting a fair argument there would be a significant noise impact from those sources. The parking lot noise impacts predicted by appellants are largely hypothetical, given the City's parking restrictions in that lot, and appellants' impact calculations are based on data from a different project that cannot reasonably be applied to the Dream Center in the manner advocated by appellants. Appellants' argument that the noise from residents' outdoor activities would constitute a significant environmental impact is also based on a flawed analysis. As we explain below, any noise impacts identified by appellants were not significant under CEQA and did not require preparation of an EIR.

## I. FACTUAL AND PROCEDURAL BACKGROUND

SAY is a non-profit organization founded in 1971 by four local community leaders aiming to provide "hope, support, and opportunity to Sonoma County youth and their families." SAY operates several programs and facilities in Sonoma County focusing on three core areas: housing, counseling, and jobs.

Conceived to serve children, teens, youth, and young adults, the SAY Dream Center planned to provide an emergency shelter with up to 12 beds for homeless youth for up to three months, and up to 51 beds for longer term transitional housing for residents ages 18 to 24. The Dream Center would also offer counseling services for individuals and families, health and wellness services for individuals 5 through 24, and education, job skills training, and job placement services for youth and young adults.

2

Those served by the Dream Center would include children who have been physically, sexually or emotionally abused, runaways, homeless youth, former foster youth, and homeless young adults who have been unable to afford housing or find employment.

The Dream Center was to be housed in a converted facility that was the former Warrack Hospital on a site located in southeast Santa Rosa. The hospital had been closed in 2008, and the building had been donated to SAY in 2012. The facility included an existing commercial kitchen to be used for job training and meal preparation for residents and staff. The site had earlier been developed as a medical campus, including the former and now vacant hospital building in the center of the site, as well as separate occupied office and medical buildings and parking areas surrounding the central building. The Dream Center property is bordered on two sides (north and east) by streets that separate it from its neighbors, but on the south, it is bordered by single-family homes, separated from them by a parking area, a wooden fence, and mature landscaping. To the west it abuts to condominium-style single-family homes and a convalescent hospital.

On August 8, 2013, SAY filed applications for a conditional use permit (CUP), rezoning, and design review necessary to implement plans for the Dream Center. Many prominent community members and organizations publicly endorsed the Project. Prior to and just after the applications were filed, the City held two neighborhood meetings to allow for public input about the Dream Center. On December 6, 2013, the City prepared a draft Initial Study/Negative Declaration which identified no significant effects on the environment. After a 20-day public comment period, the City prepared a revised Initial Study/Negative Declaration with responses to comments. On January 23, 2014, the City of Santa Rosa Planning Commission (Commission) held a public hearing on the Project. On that day, the Commission, by unanimous vote, passed resolutions adopting the negative declaration, recommending rezoning of eight properties as necessitated by the Project plans, and approving the CUP.

On February 3, 2014, one neighbor of the Project, Turley, appealed the Commission's decision to the Santa Rosa City Council (Council), later joined by Jensen. On March 25, 2014, the Council held a public hearing. On that day, approximately four

3

hours before the scheduled hearing, appellants' attorney submitted by email an 11-page letter to the Council critiquing the Initial Study. Appellants' letter mentioned another noise study performed by the same acoustical consulting firm at a different site in the City, and included in the record a copy of that study (Tower Market Study). Appellants pointed out the Tower Market estimate of the noise created by cars and trucks. They did not, however, articulate in the letter or in their presentation at the hearing the detailed calculations they include in their appellate briefs.

At the conclusion of the hearing, the Council, by unanimous vote, adopted two resolutions denying the appeal, and adopting the negative declaration, making findings and determinations, and approving the CUP. A few days later the Council amended the Santa Rosa City Code (City Code)[2] to reclassify the eight properties. The Council's findings included: (1) the zoning amendment is consistent with the goals and policies of all elements of the General Plan; (2) the site is physically suitable for the Project because the site was originally developed to house public institutional and office land uses and the infrastructure is adequate; and (3) the proposed rezoning is consistent with General Plan policies, including but not limited to ensuring adequate sites are available for development of a variety of housing types for all income levels, including transitional housing and homeless shelters, expanding the supply of housing available to lower income households, and supporting programs that address long-term solutions to homelessness. The Council found that granting the CUP would not constitute a nuisance or be injurious or detrimental to the public interest, health, safety, convenience, or welfare, or materially injurious to persons, property, or improvements in the vicinity. It also certified the Project was reviewed in compliance with CEQA. The Project was approved with 26 conditions of approval (COA), including posting of a contact number for any neighborhood concerns (COA 20.G) and quarterly meetings with neighboring residents (COA 20.I). Opposition came largely, if not exclusively, from neighbors of the

_____

[2] On our own motion, we take judicial notice of the City Code, available online at http://qcode.us/codes/santarosa (as of May 1, 2018). (Evid. Code, §§ 452, subd. (b) & 459.)

4

Dream Center, including appellants.  On March 27, 2014, the City filed a Notice of Determination reflecting adoption of the negative declaration without mitigation measures.

On April 23, 2014, appellants filed a petition for writ of administrative mandate in Sonoma County Superior Court, which was heard on January 8, 2015.  The court denied the petition.  This timely appeal followed.

## II.    DISCUSSION

A. *The Applicable Law*

1.  CEQA's Requirements

Whenever a proposed project "may have a significant effect on the environment," the lead agency considering approval of the project must prepare an EIR.  (Pub. Resources Code, § 21151, subd. (a).)  CEQA defines a significant effect on the environment as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project," including impacts on "ambient noise."  (Guidelines,[3] § 15382; Pub. Resources Code, §§ 21060.5, 21151, subd. (b).)  Appellants focus their appeal on increased noise levels at the southern border of the Project resulting from outdoor recreational activities at the Dream Center (gardening, pottery throwing, and basketball) and use of its south parking lot.

2.  The "Fair Argument" Standard Applicable to the City

The standard for determining whether an EIR must be prepared is whether there is substantial evidence in the record to support a " 'fair argument' " that a project may entail significant environmental effects, even if there is other substantial evidence there will not be such an impact.  (*Stanislaus Audubon Society, Inc. v. County of Stanislaus* (1995) 33 Cal.App.4th 144, 151 (*Stanislaus Audubon Society*); *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316; Guidelines, § 15064.)  "The 'fair argument' test is derived from [Public Resources Code] section 21151, which requires an EIR on any

---

[3] The Guidelines for the Implementation of the California Environmental Quality Act, California Code of Regulations, title 14, § 15000 et seq. (Guidelines).

project which 'may have a significant effect on the environment.' That section mandates preparation of an EIR in the first instance 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75.) If there is substantial evidence of such impact, contrary evidence is not adequate to support a decision to dispense with an EIR. [Citations, including Guidelines, § 15064, subds. (g), (h).] Section 21151 creates a low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted." (*Sierra Club*, at pp. 1316–1317.) Nevertheless, if the lead agency determines there is no substantial evidence in the whole record before it that the project will have a significant effect on the environment, the agency may issue a negative declaration. (Pub. Resources Code, § 21080, subd. (c)(l).)

3. Determining Whether an Impact is Significant

"The determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved, based to the extent possible on scientific and factual data. An ironclad definition of significant effect is not always possible because the significance of an activity may vary with the setting. For example, an activity which may not be significant in an urban area may be significant in a rural area." (Guidelines, § 15064, subd. (b); see also *id*., subd. (c); *National Parks & Conservation Assn. v. County of Riverside* (1999) 71 Cal.App.4th 1341, 1358.) "The lead agency has substantial discretion in determining the appropriate threshold of significance to evaluate the severity of a particular impact." (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 192.)

The Guidelines encourage agencies to develop "thresholds of significance" to aid them in determining when an environmental effect is significant. A threshold is an "identifiable quantitative, qualitative, or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be

6

determined to be less than significant." (Guidelines, § 15064.7, subd. (a).) Thresholds of significance are not used to determine automatically whether a given effect will or will not be significant. Instead, thresholds of significance are indicative only that an environmental effect that crosses the threshold " 'will *normally* be determined to be significant,' " while effects not crossing the threshold " '*normally* will be determined to be less-than-significant' " by the agency. (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1108–1109; Guidelines, § 15064.7, subd. (a).) Sample questions are set forth in Appendix G, printed following Guidelines Public Resources Code section 15387, which may be considered "thresholds of significance." (See *San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202, 227.) CEQA does not set numeric noise thresholds in Appendix G. The City marked all of the Appendix G threshold criteria either "no impact" or "less-than-significant impact."

    4. Standard of Review

Appellants insist we must independently exercise our judgment in our review of the City's decision to issue a negative declaration. They argue application of the "fair argument" standard is a question of law, and deference to the agency's determination is not required. (*Stanislaus Audubon Society, supra*, 33 Cal.App.4th at p. 151.) But this is at best an oversimplification. "The fair argument standard Guidelines section 15064, subdivision (f)(1), sets forth applies by its terms to determinations of a *lead agency*, not of a court." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1112.)

Rather, a city's "decision to issue a negative declaration . . . is reviewed for 'prejudicial abuse of discretion,' which 'is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence'." (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 171; see also, *Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 198 (*Clews*).) " 'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the

correct procedures, scrupulously enforcing all legislatively mandated CEQA requirements, we accord greater deference to the agency's substantive factual conclusions. [Citation.] In CEQA cases, as in other mandamus cases, we independently review the administrative record under the same standard of review that governs the trial court.' " (*San Francisco Baykeeper, Inc. v. State Lands Com.*, *supra*, 242 Cal.App.4th at p. 216; see generally, *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1374–1375 (*Gentry*); *Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1602–1603 [courts employ "a hybrid, quasi-independent standard of review" in which their " 'function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made' "].) Put otherwise, "[a] city's decision to rely on [a negative declaration] under CEQA is reviewed for abuse of discretion under the 'fair argument' standard." (*Wollmer v. City of Berkeley* (2009) 179 Cal.App.4th 933, 939.) The petitioner bears the burden of proof to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact. (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 899 (*Porterville Citizens*).)

B. *The Santa Rosa Noise Ordinance*

City Code section 17-16.030 sets forth certain "base" ambient noise levels tied to the character of various parts of the City: "The following criteria will be used as a base (ambient noise level) from which noise levels can be compared."

| Zone | Time | Sound Level A (decibels) Community Environment Classification |
|---|---|---|
| R1 and R2 | 10 p.m. to 7 a.m. | 45 |
| R1 and R2 | 7 p.m. to 10 p.m. | 50 |
| R1 and R2 | 7 a.m. to 7 p.m. | 55 |
| Multi-family | 10 p.m. to 7 a.m. | 50 |
| Multi-family | 7 a.m. to 10 p.m. | 55 |
| Office & Commercial | 10 p.m. to 7 a.m. | 55 |
| Office & Commercial | 7 a.m. to 10 p.m. | 60 |
| Intensive Commercial [fn omitted] | 10 p.m. to 7 a.m. | 55 |
| Intensive Commercial | 7 a.m. to 10 p.m. | 65 |
| Industrial | Anytime | 70 |

Appellants in earlier procedural phases of their challenge have treated the above listed "base" levels as maximum allowable noise levels for the times of day indicated.

But that is not correct.  Rather, as the City Code states, the base levels are intended to be used for comparative purposes.  The values reflected in the table above represent standard or normally acceptable noise levels for the zones and times indicated.  As we construe the City Code, they do not constitute thresholds of significance.

Certain noise-generating sources are governed by specific maximum decibel (dB or dBA)[4] levels in the Noise Ordinance, such as noise generated by mechanical equipment, which must not exceed 5 dBA $L_{eq}$ more than the base levels identified above.[5] (City Code, § 17-16.120.)  The City Code dictates no standard numeric measure expressed in decibel levels for other types of noise involved at the Dream Center, such as parking lot noise or the residents' recreational activities.  As SAY's noise expert told the Council, "the noise ordinance actually only regulates machinery and equipment.  It doesn't regulate outdoor use such as the pottery area, such as the basketball court, that sort of thing."  Those types of noise, he explained, are governed by the General Plan, which allows up to 60 dBA $L_{dn}$[6] in residential neighborhoods.  Even from that level the

---

[4] The designation dBA, as distinguished from dB (decibel), indicates an A-weighted value.  The "A-weighted" noise level attempts to mimic the disruptive effect of noise on the human ear by deemphasizing the very low and very high frequency components of noise.  The noise level meters used in the Noise Study filtered noises so that the dBA values they registered were A-weighted.

[5] Other regulated sound sources include radios and televisions, drums, hawkers, animals and leaf-blowers.  (City Code, §§ 17-16.070 to 17-16.125.)  Amplified sound is similarly regulated.  (City Code, §§ 17-16.160 to 17-16.210.)  There is also a numeric limitation on noise from vehicles that corresponds to the Vehicle Code standards.  (City Code, § 17-16.150.)

[6] $L_{dn}$, the average day/night noise level, is the average A-weighted noise level during a 24-hour day, obtained after addition of 10 decibels to levels measured in the night between 10:00 p.m. and 7:00 a.m.  This measure reduces the highs and lows within the decibel range and allows comparison using only one value.  A related metric, known as $L_{eq}$, or "equivalent noise level," is the average A-weighted noise level during any given measurement period, typically of 15 minutes' duration or more.  For residential areas, the City Code uses measurement periods to separately designate allowable noise values for day, evening and nighttime hours.  (City Code, § 17-16.030.)

noise expert said, "you can go up about five decibels" before a significant impact would occur.

We conclude the noise sources concerned in this appeal are governed by City Code section 17-16.040, an issue we determine de novo. (*Clews*, *supra*, 19 Cal.App.5th at p. 185.) That section establishes a set of criteria to be considered in determining whether a noise impact violates the Noise Ordinance, in which the level of noise is but one factor: "[I]t is unlawful for any person to willfully make or continue, or cause to be made or continued, any loud, unnecessary, or unusual noise which disturbs the peace or quiet of any neighborhood or which causes discomfort or annoyance to any reasonable person of normal sensitiveness residing in the area. [¶] The standards which shall be considered in determining whether a violation of the provisions of this section exists shall include, but not be limited to the following:

(A)     The level of noise;

(B)     The intensity of the noise;

(C)     Whether the nature of the noise is usual or unusual;

(D)     Whether the origin of the noise is natural or unnatural;

(E)     The level and intensity of the background noise, if any;

(F)     The proximity of the noise to residential sleeping facilities;

(G)     The nature and zoning of the area within which the noise emanates;

(H)     The density of the inhabitation of the area within which the noise emanates;

(I)     The time of the day or night the noise occurs;

(J)     The duration of the noise;

(K)     Whether the noise is recurrent, intermittent or constant;

(L)     Whether the noise is produced by a commercial or noncommercial activity." (City Code, § 17-16.040.)

10

C. *The Noise Study*

To assess the noise impacts of the Project on the surrounding residences, SAY hired Fred Svinth of Illingworth & Rodkin, Inc., an engineering firm specializing in acoustics and air quality. Svinth performed a Noise Study for the Project, concluding there were no significant noise impacts. The Noise Study was incorporated into the Initial Study for the Project by the City and relied upon in reaching its decision to issue a negative declaration.

In considering noise impacts, Svinth explained that allowances must be made for the difference between the more disruptive effect of noise at night versus during the day. To take account of these differences, experts calculate a "day/night average noise level" ($L_{dn}$) by adding 10 dBA to the nighttime measured noise level stated as an equivalent noise level ($L_{eq}$). Svinth calculated an overall two-day day/night average noise level of 52 dBA $L_{dn}$. A sound level meter at the southwest corner of the Project area showed slightly higher readings, resulting in a calculated value of 53 dBA $L_{dn}$.

The Noise Study pointed out that under the General Plan, "[s]ingle family residential uses are considered to be normally acceptable in areas with a noise environment of $L_{dn}$ of less than 60 dBA and conditionally acceptable in areas exposed to an $L_{dn}$ of 55 to 70 dBA."

In addition to the "base ambient noise levels" established under City Code section 17-16.030, as reflected in the Table on page 8, above, Svinth reported actual measured noise levels: hourly daytime noises at the south border of the Project ranged from 45 to 56 dBA (7 a.m. to 10 p.m.), and average hourly nighttime noise levels (10 p.m. to 7 a.m.) ranged from 41 to 47 dBA.[7] Svinth did not break out a separate evening noise level and

---

[7] The noise measurements for the Noise Study were made during a 48-hour period in August of 2011, long before the Dream Center project was proposed. Two sound level meters, one at the southern property line of the Project near the southeast corner, and one at the southwest corner, recorded historical measurements. These were used in the Noise Study, since there had been no major changes in the neighborhood in the interim. Warrack Hospital had been closed in 2008, so the noise level measurements taken in 2011 and used in the Noise Study showed results with an empty hospital building.

did not calculate separate equivalent noise levels for daytime and nighttime noise ($L_{eq}$). Instead, Svinth consistently used the day/night average to assess noise impacts. (See fn. 6, *ante*.)

He explained that a greater increase in noise levels is tolerated in areas that are quieter, such as the Dream Center neighborhood, which remain under the base noise levels specified in the Noise Ordinance. For such projects, a 5 dBA $L_{dn}$ increase in existing noise would establish the noise impact threshold, while for projects in noisier areas, where the existing ambient noise level was above the base levels set forth in the City Code, an addition of 3 dBA $L_{dn}$ would mark the noise significance threshold. Svinth explained at the Council hearing that these dBA increases in noise do not by themselves establish a violation of the Noise Ordinance; they are but a threshold for a CEQA determination of significance.

In his Noise Study, Svinth identified "significance criteria" for the Project, drawing upon the sample questions propounded in Appendix G to the Guidelines. We are concerned with criteria one and three: "1) A significant noise impact would result if the project would expose persons to or generate noise levels that would exceed applicable noise standards presented in the General Plan or Noise Ordinance;" and "3) A significant impact would be identified if operation of, or traffic generated by, the project would substantially increase noise levels, or exceed Noise Ordinance limits at sensitive receivers in the vicinity. Considering that the existing noise environment at noise sensitive uses on the project periphery are below the normally acceptable noise level standard, a substantial increase would occur if noise levels with the project would be 5 dBA $L_{dn}$ or greater above existing conditions." As we read the document, criterion one defers to pre-existing standards in the Noise Ordinance and General Plan, while criterion three sets forth a numeric significance threshold.

Since Svinth had calculated an existing $L_{dn}$ of 52 at the south border and 53 at the southwest tip of the Project, applying Svinth's third criterion, we infer the Project would cross the significance threshold if the projected $L_{dn}$ exceeded 57 dBA at the southern boundary or 58 dBA $L_{dn}$ at the southwest tip of the Project. Svinth compared the impact

12

of outdoor activities (a maximum of 53 $L_{dn}$) and traffic noise (a maximum increase of 1 dBA $L_{dn}$) to the existing $L_{dn}$ levels at the Project and concluded there was no significant impact.

Svinth limited his analysis of traffic noise to additional traffic on the streets surrounding the Dream Center based on the assumption there would be no use of the parking lot on the southern border of the Project after regular operating hours. This assumption was reinforced by the City when it imposed on the Project a COA that allowed only SAY employees to park in the south lot, and only during the day.

D. *Appellants' Fair Argument Theory on Noise Levels*

1. Appellants' Arguments

Appellants urge us to abandon Svinth's use of $L_{dn}$ calculations and to use $L_{eq}$ calculations instead, which would result in three separate points of comparison for daytime, evening and nighttime noise. Appellants seek to persuade us there is a fair argument that the existing ambient noise levels utilized in the noise analysis should have been reduced below the values specified in the Noise Ordinance because the vicinity of the Dream Center was an exceptionally quiet neighborhood. Then, using a methodology employed by Svinth in a different noise study prepared for a different project in a different part of town, they contend significant noise impacts originating from the parking lot and outdoor activities would increase ambient noise levels 5 dBA $L_{eq}$ or more, which they contend would constitute a "significant impact" requiring an EIR.[8]

Employing an averaging technique ostensibly derived from the Tower Market Study, and working with a chart (not easily decipherable) from the Noise Study, appellants purport to have calculated the existing ambient noise levels for the Project. These calculations were not a part of the Noise Study, were not presented to the City in the appeal process, and no expert has confirmed their accuracy. The numbers do not

---

[8] This is a slight distortion of Svinth's statement that an increase of 5 dBA $L_{dn}$ would establish a noise threshold, but they argue based on the Tower Market Study that an increase of 5 dBA $L_{eq}$ would not just establish a noise effect threshold, but a noise level maximum that could not be exceeded without preparation of an EIR.

appear in the administrative record and first appeared in appellants' reply brief in superior court. For that reason alone, we would be justified in ignoring appellants' calculations.[9] (See Code Civ. Proc., § 1094.5, subd. (e); *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571, 573 [traditional mandamus]; *Porterville Citizens*, *supra*, 157 Cal.App.4th at pp. 893–899 [same].) As the City rightly observes, by manipulating data and drawing conclusions from charts and numbers in the two noise studies, appellants have cast themselves in the role of noise experts. But even if we were to accept these base level calculations at face value, as we shall discuss, the remainder of appellants' assumptions and calculations casts the sum of their work into doubt and prevents us from finding there is a fair argument that an EIR is required.

2. The Tower Market Noise Study

The Tower Market Study, also prepared by Svinth, assessed impacts occasioned by development of a 24-hour convenience market and gas station in a different, more densely populated part of Santa Rosa, where existing noise levels were higher than in the area of the Dream Center and higher than the base ambient noise levels in the Noise Ordinance.[10] Despite the differences in setting, appellants point to the Tower Market Study as an alternative means of analyzing noise impacts, and they claim if the Tower Market method had been used in analyzing noise impacts from the Dream Center, it would have revealed substantial evidence of a fair argument that noise would create a

---

[9] Issuance of a conditional use permit is a quasi-judicial function properly reviewed by administrative mandate (*Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 434), which is how appellants proceeded in this case. Appellants made no showing under Code of Civil Procedure section 1094.5, subdivision (e), either in the trial court or in this court.

[10] Because the Tower Market neighborhood was zoned multi-family, we infer it was more densely populated than the area to the south of the Dream Center. Hence, the base ambient noise levels under the Noise Ordinance were 55 dBA during the day, 55 dBA in the evening, and 50 dBA at night (City Code, § 17-16.030; see Table on p. 8, *ante*.) Pre-existing conditions at the Tower Market site already exceeded those levels. (See fn. 12, *post*.)

14

significant environmental impact along the Project's southern border from parking lot noise and residents' outdoor activities.

Appellants use the Tower Market Study in two different ways. First, they urge us to adopt the *methodology* used by Svinth in the Tower Market Study for analysis of the Dream Center noise impacts. Second, they borrow from the Tower Market Study *specific noise values* for cars and trucks and assume these raw noise data would apply as impact data at the southern property line of the Dream Center. Although we can agree conceptually that the Tower Market methodology could just as well have been employed for the Dream Center noise analysis, appellants fail to convince us the numbers they purport to derive using that technique—and specifically the noise impacts they predict— are creditable evidence of a significant impact under CEQA.

In the Tower Market Study, Svinth broke the day into three time periods instead of two and used three values of $L_{eq}$ instead of a single $L_{dn}$ value. He measured the existing base ambient noise level for each period of the day with two meters, one at the nearest property line and another at an outdoor area of public common use. We will focus on the effects at the nearest property line, which also showed the biggest impacts. Svinth then added 5 dBA $L_{eq}$ to each period's actual base ambient noise level to get the $L_{eq}$ at which the threshold of significance would be crossed, which he called the "site specific (adjusted) allowable noise levels."[11] Finally, Svinth compared the predicted noise from Tower Market operations to the site specific allowable noise levels. He then concluded that noise from Tower Market operations could exceed the maximum allowable $L_{eq}$ during some periods, and recommended mitigation measures to reduce those impacts.

The Tower Market Study also recognized a decibel value for vehicles: noise from a passing car going 15 mph would range from 55-65 dBA at 25 feet, and trucks would generate noise in the range of 60-80 dBA at 50 feet, depending upon the type of truck. It

___

[11] The measured values at the property line were 61 dBA $L_{eq}$ during the day, 60 dBA $L_{eq}$ in the evenings, and 55 dBA $L_{eq}$ at night. By adding 5 dBA to each of those values, Svinth calculated the "site specific (adjusted) allowable noise levels" as 66 dBA $L_{eq}$ (day), 65 dBA $L_{eq}$ (evening) and 60 dBA $L_{eq}$ (night) at the multi-family property line.

appears from the Tower Market Study that the raw decibel levels from cars and trucks do not translate directly to a final noise impact at the relevant point of interest, however. Such values did not result in an 80 dBA $L_{eq}$ at the nearest property line in the Tower Market Study; rather, the impact numbers were calculated as 48 to 63 dBA resulting from cars, 56 to 66 dBA resulting from light trucks, and 62 to 75 dBA resulting from heavy fuel trucks. Svinth did not include a calculation of the average noise from cars and trucks at the nearest property line using either an $L_{dn}$ or a day-evening-night $L_{eq}$ average.

3. Appellants' Calculations Using $L_{eq}$ Instead of $L_{dn}$

Svinth's $L_{dn}$ calculation in the Noise Study, by definition, did not distinguish between evening hours and nighttime hours. Appellants treat this as a flaw in the study, perhaps, they suggest, as a result of the City's pre-ordained decision to approve the Dream Center project. They insinuate Svinth chose to use $L_{dn}$ numbers for comparison in his study for the very purpose of "reduc[ing] the significance of a noise impact" at the Project.[12]

Appellants insist that by using $L_{eq}$ values for daytime, evening and night, a fair argument can be made that noise from the Dream Center would create a significant environmental impact in the residential neighborhood on its southern border. The trial court called the $L_{eq}$ versus $L_{dn}$ argument a "distinction without a difference," and we tend to agree. The two methods of presenting noise evidence are simply different means of averaging noise levels for more meaningful comparison and would not be expected to cause a significant difference in result when considering noise impacts.

_____

[12] Svinth stated in his Noise Study that he would "use $L_{eq}$ for purposes of determining noise with respect to the base ambient noise levels," but then consistently used single day/night average ($L_{dn}$) values instead. Appellants would have us treat this as a sleight of hand by Svinth, accusing him of unjustifiably "switch[ing]" his mode of analysis to intentionally "reduce the significance of a noise impact." We take a less jaundiced view of Svinth's work. We defer to the City's implied assessment that Svinth was credible and his work was performed with integrity. (See *Stanislaus Audubon Society*, *supra*, 33 Cal.App.4th at p. 151 [lead agency given the "benefit of a doubt on any legitimate, disputed issues of credibility"].)

16

Nevertheless, to come up with their own competing base dBA $L_{eq}$ numbers, appellants extrapolate from measured values, calculating the existing values for the south border of the Project as: as 49.9 dBA $L_{eq}$ in the daytime (7 a.m. to 7 p.m.), 47.5 dBA $L_{eq}$ in the evening (7 p.m. to 10 p.m.), and 43.6 dBA $L_{eq}$ at night (10 p.m. to 7 a.m.) based on actual measurements taken in 2011. They suggest using these numbers as a starting point for assessing noise impacts, rather than the 55-50-45 dBA base levels provided in City Code section 17-16.030. (See Table, p. 8, *ante*.)

Appellants then add 5 dBA to each of the three time periods in the day, reasoning that the resulting sums would establish the maximum non-significant values for each time period or the same sort of "site specific adjusted allowable noise levels" calculated in the Tower Market Study, but not in the Noise Study: 54.9 dBA $L_{eq}$ (daytime); 52.5 dBA $L_{eq}$ (evening); and 48.6 dBA $L_{eq}$ (night). They justify this step by reference to the Tower Market Study, where Svinth made a similar calculation. Appellants would have us treat these numbers as absolute maximum noise limits above which a significant impact would be found. Svinth clarified at the Council hearing, however, that a 5 dBA increase is considered the "threshold of significance," not an absolute maximum. He said "60" dBA is the allowable limit under the General Plan. He further opined, "this project will go nowhere near that." Hence, we question whether appellants' calculated numbers constitute substantial evidence of a fair argument on both legal and factual grounds.

Although they present their numbers as scientific fact, we find appellants' calculations are essentially opinions rendered by nonexperts, which do not amount to substantial evidence. (*Gentry*, *supra*, 36 Cal.App.4th at p. 1417 ["dire predictions by nonexperts" not substantial evidence]; accord, *Porterville Citizens*, *supra*, 157 Cal.App.4th at p. 899.) Though appellants imply that Svinth himself approved of their calculations and their use of data from the Tower Market Study, his actual statement was ambiguous and cannot be read as an endorsement of calculations appellants had not

17

even performed at the time.[13] On the contrary, even after considering the points raised in their 11-page letter, Svinth confirmed at the hearing before the Council that noise impacts from the Dream Center would not violate either the Noise Ordinance or the General Plan.

E. *Parking Lot Noise*

Appellants argue noise from the Project parking lot "could violate the City's ambient base noise level limits." Because the COA imposed by the City does not prohibit traffic through the south parking lot (as opposed to parking in that lot), appellants argue "cars (or delivery trucks) would be permitted to come and go at any time of the day or night. They would be separated from residential homes by only a wooden fence of minimal noise attenuating character." Even if we accept appellants' presumption that motorists will drive through the south parking lot, we find reason to doubt appellants' noise impact predictions.

We begin with the obvious. At Tower Market, traffic and parking lot noise predictably would be different from, more continuous than, and louder than in the south parking lot of the Dream Center. It is reasonable to believe there would be a more or less constant stream of cars arriving at and departing from a 24-hour convenience center and gas station, including at night. There would be frequent deliveries to the market and loud fueling trucks servicing the gas station. In contrast, cars passing through the south parking lot of the Dream Center would be expected to do so far less frequently, delivery truck traffic would be "minimal" or non-existent, and fuel trucks would not be in the picture at all. The two projects are not similar and we do not feel confident importing data from a wholly different noise study into the Dream Center study, at least in the manner appellants ask us to use that data.

---

[13] Appellants suggest Svinth himself approved their use of the Tower Market Study as "valid." Svinth said, "and then the parking, it's kind of interesting that they used another study that I did for a gas station for the parking lot noise. And that's fine. Those levels are all valid." It is unclear how far Svinth intended to go in vouching for appellants' theory. We do not read his comments as endorsing appellants' detailed calculations or their argument that parking lot noise impacts from two very different projects would be the same.

18

As noted above, Svinth did set forth in the Tower Market Study that noise associated with a passing car ranges from 55-65 dBA at 25 feet, and noise from trucks runs as high as 60-80 dBA at 50 feet, depending on the type of truck. Because these levels greatly exceed appellants' calculated maximum noise levels (54.9 dBA $L_{eq}$ (daytime), 52.5 dBA $L_{eq}$ (evening), and 48.6 dBA $L_{eq}$ (night)), appellants insist there is a fair argument that traffic noise in the south parking lot would create a significant noise impact along the southern border of the Dream Center at all times of day and night. Appellants simply take the range of noise from cars and trucks (55-80 dBA) and assume those numbers would apply as noise impacts at the southern border of the Dream Center.

We reject appellants' parking lot noise arguments for three reasons: (1) we lack confidence in appellants' predicted noise impacts, which amount to nonexpert opinion; (2) appellants' predictions are based on speculation about traffic, given parking restrictions in the south lot and the fact that the main entrance to the site is on the north side; and (3) appellants' reading of the Noise Ordinance is inconsistent with ours.

First, appellants use raw data from the Tower Market Study which does not include an average noise impact calculation. That study says, "a passing car" causes noise in the range of 55-65 dBA as it passes at 15 mph, but that says very little about what the noise impact will be over the course of a day or an evening. To predict the noise value over time, it would be necessary to calculate some sort of average noise level ($L_{eq}$ or $L_{dn}$). This is illustrated by the fact that even at Tower Market, which undoubtedly anticipated greater traffic passing through its parking lot, the impact at the nearest property line was not simply calculated as 80 dBA $L_{eq}$ as appellants suggest it should be at the Dream Center, arguing that noise from cars and trucks would exceed their calculated noise thresholds by as much as 31 dBA at night. Instead, Svinth reported the noise resulting from cars and trucks in Tower Market's parking lot as a range of decibel levels, none of which was as high as 80 dBA. Even if we accept as a general matter that cars and trucks make noise in the range of 55-80 dBA, we still cannot accept appellants' position that those dBA values can simply be imported into the Dream Center Noise Study as noise values on the southern border. Such a view is not backed up by any expert

opinion and is inconsistent with the treatment of those same numbers in the Tower Market Study. It appears to us that further refining calculations by an expert would be necessary to predict an accurate dBA $L_{eq}$ or $L_{dn}$ noise level at the first residential property line.

Thus, appellants' argument that the noise impacts from the parking lot would be 55 to 80 dBA $L_{eq}$ at the southern border is not supported by substantial evidence. Substantial evidence to support a fair argument means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a); *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 927–928; *League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 905.) Substantial evidence supporting a fair argument must be of " 'ponderable legal significance . . . reasonable in nature, credible, and of solid value.' " (*Lucas Valley Homeowners Assn. v. County of Marin* (1991) 233 Cal.App.3d 130, 142.) Appellants' noise predictions do not meet that standard.

We further regard appellants' arguments as resting on supposition and hypothesis, rather than fact, expert opinion, or reasonable inference. Appellants all but ignore the parking restriction that allows only SAY employees to park in the south lot, and only during the day, calling it a "last minute maneuver" by the City that leaves intact their fair argument of excess parking lot noise. Yet, there has been no showing the COA would be ignored or ineffective, and we will not indulge appellants' invitation to ignore it.[14] Appellants emphasize the COA does not prevent cars from driving through—as opposed to parking in—the south parking lot. They point out all of the parking lots are connected, with no barriers between them. Therefore, they rely on "[c]ommon sense" to suggest that residents, residents' guests, and delivery trucks will

---

[14] Appellants claim even if the parking restriction is enforced, the use of the south parking lot by SAY employees during the day would have a significant noise impact on the Project's south side neighbors, again using the same traffic noise data from the Tower Market Study. Because we cannot accept appellants' use of this data as impact data at the southern boundary, we reject this contention as well.

20

drive through the south parking lot to get to other parking areas or places within the Dream Center complex. Appellants argue these hypothetical trips could happen at "any time of day or night" because the COAs do not impose any time restrictions on driving through the Project's south parking area. We reject these suppositions as not supported by substantial evidence.

The fact is the parking supply on site is more than adequate to accommodate the proposed new uses by the Dream Center, in addition to existing ongoing uses, and the south parking lot provides only a small part of the parking supply. The main entry to the Dream Center is on the north side of the site. Most of the residents of the Dream Center are not expected to own cars or to use parking spaces and are not permitted to park in the south lot at all. The maximum number of visitors on site requiring parking at any one time will be 15, and visitors will not be allowed to park in the south lot. In addition, there is no reason trucks would need to drive through the south parking lot to access the loading zone. Delivery trucks would normally access the site via the main entrance on the north side of the property. And of course, the noisiest of the Tower Market trucks— those bringing fuel to the gas station—would have no business at the Dream Center whatsoever. Hence, appellants' prediction that trucks and cars will drive through the south parking lot at all hours of the day and night is most improbable and not a fair inference from the evidence. Similarly, appellants' doubt about whether drivers will choose to abide by the no parking rule is pure speculation.

Finally, we disagree with appellants to the extent they suggest a 5 dBA $L_{eq}$ increase over pre-existing conditions would constitute a violation of the Noise Ordinance under Svinth's first criterion. We construe the Noise Ordinance as providing a more flexible and qualitative approach than appellants acknowledge. The decision whether a noise violation has occurred depends on multiple factors, not simple numeric calculations, including the intensity of the sound, whether the sound emanates from a natural or unnatural source, is usual or unusual, what time of day it occurs, and its duration. (City Code, § 17-16.040.) Given our interpretation of the City Code, we do not agree with appellants' setting a hard-and-fast maximum noise level at 5 dBA above

existing levels. Svinth told the Council the maximum noise level for the neighborhood around the Dream Center was 60 dBA $L_{dn}$ under the General Plan. The noise generated by traffic in the Dream Center's south parking lot would not approach that level, appellants' nonexpert speculation notwithstanding. We conclude appellants have presented no substantial evidence of a fair argument that noise from the south parking lot would create a significant environmental impact.

F.      *Noise from Dream Center Recreational Activities*

SAY planned outdoor recreation areas for the Dream Center's young residents, including a community garden, a half-court basketball area,[15] and a pottery throwing area. The pottery throwing area was approximately 90 feet from the southern boundary of the Dream Center, the garden was approximately 105 feet from that border, and the basketball court was approximately 300 feet from it. Basketball was the noisiest of the activities, but the Noise Study concluded the basketball court would create less noise at the southern border than the pottery and gardening activities because it was located farther away. A COA allowed participants to engage in these activities only during the day (no later than 9:00 p.m.). No outdoor amplified music was allowed at any time.

Because Dream Center residents would be allowed to engage in these pastimes until 9:00 p.m., and based on appellants' own calculated maximum allowable ambient noise level of 52.5 dBA $L_{eq}$ between 7:00 p.m. and 9:00 p.m., appellants claim to identify a potentially significant noise impact in the evening hours from Dream Center recreational activities. But that prediction relies on a range of dBA values, without timeframes assigned, not expressed as $L_{eq}$ or $L_{dn}$ averages. According to the Noise Study, the outdoor activities at the Project could create noise in the following ranges: Pottery Making: 48-55 dBA; Community Gardening: 54-57 dBA; Basketball: 50-52 dBA. No

_____

[15] Respondents claim the basketball court was eliminated from the Dream Center plans after the Project was approved and suggest in their respondents' brief we take judicial notice of that fact. They did not file a separate motion as required by rule 8.252(a), California Rules of Court. Hence, we do not take judicial notice and do not consider the issue relating to basketball noise to be moot.

22

specific $L_{eq}$ numbers were assigned to these activities corresponding to times of day. Again, Svinth used the values of 51 dBA $L_{dn}$ for basketball and 53 dBA $L_{dn}$ for gardening and pottery making. The southern border already was subject to 52 dBA $L_{dn}$, and the southwest corner was 53 dBA $L_{dn}$, so the Noise Study concluded these activities would not create significant environmental impacts, which Svinth confirmed in person at the Council hearing. In fact, Svinth said his Noise Study had overstated the impact of noise from outdoor activities by calculating use for longer hours than residents would typically use the facilities.

Nevertheless, appellants claim noise from gardening activities and making pottery would conceivably exceed the existing ambient noise level by 5 dBA or more, either bringing it, they argue, into direct violation of the Noise Ordinance under Svinth's criterion one, or raising noise levels "substantially" under criterion three. (See also Guidelines, Appendix G, XII(a), foll. § 15387.) Appellants' vague and hard-to-grasp methodology appears to require us to compare the highest possible predicted noise levels from the outdoor activities to appellants' own calculated maximum allowable noise levels, rather than comparing an average noise value, such as the $L_{dn}$ used by Svinth, with the base levels identified in the City Code. (City Code, § 17-16.030.) We cannot regard this as a legitimate factual or scientific basis for finding a significant impact, and it is not supported by expert opinion. In any case, the noise increases identified by appellants do not amount to violations of the Noise Ordinance or the General Plan under Svinth's criterion one. As we have explained, noise from Dream Center recreational activities is governed by the multi-factor approach of City Code section 17-16.040.

Even under Svinth's criterion three, which does set a numeric significance threshold of 5 dBA $L_{dn}$ above existing ambient noise levels, and even assuming a 5 dBA $L_{eq}$ increase above existing conditions would similarly cross the noise significance threshold, appellants have not presented substantial evidence that noise from gardening and throwing pottery will cross that threshold. We detect very little science behind appellants' arguments and cannot draw any conclusions about significance from the numbers they provide, without expert interpretation. Appellants have identified no

23

substantial evidence in the administrative record that these activities would create noise impacts above the criterion three threshold.

The City's determination of no significant impact and its approval of a negative declaration were supported by substantial evidence in the form of Svinth's Noise Study. We cannot say the City abused its discretion by failing to proceed in the manner required by law under CEQA.

## III.  DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

_____

Streeter, Acting P.J.



We concur:



_____

Reardon, J.



_____

Schulman, J.*

_____

* Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25

Filed 5/24/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHARLES T. JENSEN et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF SANTA ROSA,<br><br>Defendant and Respondent;<br><br>SOCIAL ADVOCATES FOR YOUTH,<br><br>Real Party in Interest and Respondent. | A144782<br><br>(Sonoma County<br>Super. Ct. No. SCV255347)<br><br>**ORDER CERTIFYING OPINION<br>FOR PUBLICATION** |

THE COURT:

The opinion in the above-entitled matter filed on May 1, 2018, was not certified for publication in the Official Reports. For good cause, the requests for publication are granted.

Pursuant to California Rules of Court, rules 8.1105 and 8.1120, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports. Listing of counsel is attached hereto.

Dated: _____          _____
                                                                    Streeter, Acting P.J.

1

<u>Jensen v. City of Santa Rosa (A144782)</u>

Trial court:          Sonoma County Superior Court

Trial judge:          Hon. Elliot Lee Daum

Counsel:

        Botz Cody Law, Theodore J. Cody, and Sarah Botz for Appellant.

        City Attorney of Santa Rosa and Molly Dillon, Assistant City Attorney for Respondent City of Santa Rosa.

        Law Office of Rose M. Zoia and Rose M. Zoia for Real Party in Interest and Respondent Social Advocates for Youth.