Filed 9/6/19; Certified for Publication 10/7/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MAACAMA WATERSHED ALLIANCE, et al., | |
| Plaintiffs and Appellants, | A155606 |
| v. | (Sonoma County |
| COUNTY OF SONOMA, et al., | Super. Ct. No. SCV261451) |
| Defendants and Respondents; | |
| JAMES BAILEY, KNIGHTS BRIDGE VINEYARDS, LLC, | |
| Real Parties in Interest. | |

Maacama Watershed Alliance and Friends of Spencer Lane (collectively, appellants) appeal a judgment entered after the trial court rejected their challenge to the decision of defendants County of Sonoma and its Board of Supervisors (collectively, the County) to adopt a mitigated negative declaration and approve a use permit allowing real party in interest Knights Bridge Vineyards LLC (Knights Bridge) to construct and operate a winery (the project). Appellants contend the County should instead have prepared an environmental impact report (EIR) because there is a fair argument that construction and operation of the winery will cause a number of significant environmental effects. We shall affirm the judgment.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The project site is on Spencer Lane in Knights Valley, a rural part of Sonoma County. The 86-acre parcel lies in an area zoned Land Extensive Agriculture, a designation that allows wineries and tasting rooms as conditional uses. As approved, the project includes a two-story, approximately 5,500 square foot winery building with an adjoining 17,500 square foot wine cave, wastewater treatment and water storage facilities, fire protection facilities, and mechanical areas, covering an approximately 2.4-acre area. The project site already contains two residences and 46 acres of vineyards. The nearby area is primarily made up of vineyards; the only permitted winery in Knights Valley is 1.4 miles away. The steelhead are federally listed as a threatened species.

The County's staff reviewed reports considering effects of the project on geology, groundwater, wastewater, and biological resources, among other topics. As explained in more detail below, the staff concluded that, with recommended mitigation, the project would not have a significant effect on the environment, and recommended that the County adopt a mitigated negative declaration and approve the project. This the County's Board of Zoning Adjustments did on September 17, 2015. Finding there was no substantial evidence the project would have a significant environmental effect, it approved the use permit with conditions and adopted a mitigated negative declaration (the 2015 MND) and mitigation monitoring program.

Appellants appealed the decision to the Board of Supervisors (the Board). County staff reviewed issues raised in the appeal and in subsequent comments and prepared a revised MND (the 2016 MND). After further comments and review, particularly regarding the potential for impacts on groundwater and water quality, the County prepared a second revised MND (the 2017 MND or the MND). At a public hearing, the Board then approved the project subject to conditions and adopted the 2017 MND.

Appellants brought a petition for writ of mandate, which the trial court denied.

## DISCUSSION

### I. CEQA and Standard of Review

The California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA)[1] requires a public agency to prepare an environmental impact report (EIR) " ' " 'whenever it can be fairly argued on the basis of substantial evidence that the project may have a significant environmental impact.' " ' " (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 899 (*Porterville Citizens*); § 21151, subd. (a).) " 'May' means a reasonable possibility." (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 927 (*Pocket Protectors*).) A significant effect on the environment is "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (Guidelines, § 15382; see Pub. Resources Code, § 21060.5, 21151, subd. (b).)

The test for whether an EIR must be prepared is "whether there is substantial evidence in the record to support a ' "fair argument" ' that a project may entail significant environmental effects, even if there is other substantial evidence there will not be such an impact. . . . 'Section 21151 creates a low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted.' " (*Jensen v. City of Santa Rosa* (2018) 23 Cal.App.5th 877, 884 (*Jensen*); see §§ 21064, 21080, subd. (c)(1).) But if the lead agency determines there is no substantial evidence in the record before it that the project may have a significant effect on the environment, it may issue a negative declaration. (*Jensen*, at p. 884.) If the project may have significant effects, but

---

[1] All undesignated statutory references are to the Public Resources Code. CEQA is implemented in the CEQA Guidelines, which are found at title 14 of the California Code of Regulations, section 15000 et seq. References to the Guidelines are to the CEQA Guidelines.

mitigation measures will make the effects insignificant, the agency may adopt a mitigated negative declaration.  (§ 21080, subd. (c)(2).)

We review an agency's decision to issue a negative declaration for " 'prejudicial abuse of discretion,' which 'is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 171; § 21168.5.)  " ' "Judicial review of these two types of error differs significantly:  While we determine de novo whether the agency has employed the correct procedures, scrupulously enforcing all legislatively mandated CEQA requirements, we accord greater deference to the agency's substantive factual conclusions.  [Citation.]  In CEQA cases, as in other mandamus cases, we independently review the administrative record under the same standard of review that governs the trial court." ' " (*Jensen*, *supra*, 23 Cal.App.5th at p. 886.)  The agency's "decision to rely on an MND under CEQA is reviewed for abuse of discretion under the 'fair argument' standard." (*Wollmer v. City of Berkeley* (2009) 179 Cal.App.4th 933, 939.)  In carrying out this review, although we do not defer to the lead agency's determination, we give it the benefit of the doubt " ' "on any legitimate, disputed issues of credibility." ' " (*Pocket Protectors*, *supra*, 124 Cal.App.4th at p. 928.)  The question is whether there is substantial evidence in light of the record as a whole that it cannot be fairly argued that the project may cause a significant environmental impact.  (*City of Livermore v. Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 540-541.)

"The petitioner bears the burden of proof to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact." (*Jensen*, *supra*, 23 Cal.App.5th at p. 886, citing *Porterville Citizens*, *supra*, 157 Cal.App.4th at p. 899; accord *Gentry v. City of Murietta* (1995) 36 Cal.App.4th 1359, 1379.)  Personal observations of local residents may qualify as substantial evidence supporting a fair argument.  (*Pocket Protectors*, *supra*, 124 Cal.App.4th at p. 928.)  However, "mere argument, speculation, and unsubstantiated opinion, even expert opinion, is not substantial evidence for a fair argument.  [Citations.]

4

'The existence of public controversy over the environmental effects of a project shall not require preparation of an environmental impact report if there is no substantial evidence in light of the whole record before the lead agency that the project may have a significant effect on the environment.' [Citations.] Neither is the mere possibility of adverse impact on a few people, as opposed to the environment in general." (*Id*. at pp. 928-929.) The standard for the agency "is not whether *any* argument can be made that a project might have a significant environmental impact, but rather whether such an argument can *fairly* be made." (*Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 1003.)

With these principles in mind, we consider appellants' contentions.

## II. Geology and Erosion

### A. Background

Consideration of the project's potential for geologic impacts took place over the course of several years. In 2013, Bauer Associates (Bauer) completed a geotechnical investigation of the project (the Bauer report), which included review of published literature and Bauer's previous work at and near the site; field geologic mapping; deep core borings and trenches; study of boring cores and trench walls; monitoring of groundwater levels in borings and trenches; characterization of landslide conditions; and analysis of slope stability. Bauer found that a portion of the Knights Bridge property was underlain by a large, inactive landslide that could exceed 30,000 years in age, and that two additional landslides had ensued, up to 14,000 years ago, with possible subsequent "localized slope adjustments." The planned winery and cave were outside the boundaries of the landslide. Bauer concluded that slope stability on the project site was acceptable and that the project would not cause significant impacts for purposes of CEQA if designed in accordance with Bauer's recommendations and current building codes. The recommendations included planting graded slopes with quick growing vegetation or protecting the slopes from erosion by other means; limiting the grade of slopes; and diverting seepage and surface water runoff from the slope surfaces.

The Bauer report was subject to two peer reviews. The first was an "internal peer review" by Michael J. Dwyer of Consulting Engineering Geologic Services, who had

acted as an outside consultant as Bauer carried out its investigation. Dwyer concluded the Bauer report had properly identified and characterized the geologic conditions at the project site and had confirmed the absence of, or adequately mitigated through its recommendations, the geological and seismic hazards. Dwyer opined that the project did not have potentially significant geologic impacts that could not be mitigated through the recommendations.

The County retained an independent contractor, Cotton, Shires and Associates (Cotton Shires) to conduct a second peer review. Although Cotton Shires disagreed with some of the Bauer report's conclusions about the nature of some of the deposits on the project site, its review concluded that the project was feasible from a geotechnical standpoint, and that Bauer's recommendations would adequately mitigate concerns about slope stability.

Kjeldsen Biological Consulting carried out a biological assessment. It concluded the project would not affect special status species on or off site if best management practices were implemented, particularly silt and erosion control measures during and after construction.

Appellants' geological expert, Raymond Waldbaum, reviewed the Bauer report. He contended the Bauer report's interpretation of landslide risk and slope stability was not supported by the data in the report. He also stated that the Bauer report lacked adequate geologic maps and cross-section data.

Cotton Shires responded to Waldbaum's critique. It concluded, "Though we have disagreed with Bauer Associates regarding some aspects of the site geology, they agreed to use geologic models and strength parameters for their slope stability analysis that we found to be generally acceptable. Though it appears unlikely that we will ever agree about the origin of the matrix-supported deposits that are found near the surface at the eastern portion of the winery building site, Bauer Associates has agreed to incorporate mitigation measures designed to address the potential debris flow hazard in this area."

In a second letter, Waldbaum noted, inter alia, that the cave excavations would generate a significant volume of material, or "cave spoils." He argued that disposing of

6

the cave spoils could create slope instability or excessive erosion, and that mitigation of the hazards of cave soil disposal should not be deferred. He also contended that there was insufficient information about stormwater drainage and the potential for inappropriate discharge locations to cause slope instability.

On behalf of appellants, Kamman Hydrology & Engineering, Inc. (Kamman) and Dr. Stacy K. Li of Aquatic Systems Research expressed concern that there was insufficient information about where the cave spoils would be placed, in order to mitigate impacts to Bidwell Creek, and that no spoils management plan was available for public review. Appellants also submitted a letter to the County arguing that sediment from increased use of roads could be carried to Bidwell Creek and adversely affect its habitat.

Summit Engineering, Inc. (Summit), which had earlier prepared a hydrology report, submitted a stormwater management plan and fill placement drawings in 2017. The measures shown in the stormwater management plan include erosion barriers, such as fiber rolls and dams, and a stabilized construction entrance. At the County's request, O'Connor Environmental, Inc. (O'Connor) performed a peer review assessing, inter alia, the effects of cave spoils placement on water quality. In response to the concerns raised by Kamman, O'Connor explained on May 15, 2017, that erosion control measures included in Summit's site grading plan and best management practices would be implemented; cave spoils would be placed in specified areas where ground slopes were gentle (two percent or less), would be covered with straw mulch, would be isolated by erosion control barriers and would be placed at least 100 feet from Bidwell Creek, twice the distance required by the County's grading plan standards; and there would be a series of gravel check dams to control potential erosion from the spoils. These measures, according to O'Connor, "are expected to prevent significant erosion of cave spoils that could degrade water quality in Bidwell Creek."

Before the 2017 MND was adopted, another geologist, Dr. Jane E. Nielson, provided comments critical of it. She stated that the project site adjoined one large and two small landslides, that the wine cave tunnels would be dug into the same volcanic rock sequence that produced the largest of the landslides, and that any debris released from

7

tunneling or a collapse due to tunnel construction could alter the flow of the creek ecosystem and add sediment and other pollutants. She argued the MND was inadequate because it lacked a map showing precise locations of all elements of the project, detailed geologic maps, and cross-sections of the project area; because the experts had expressed different opinions on the soil and rock materials at the project site; because it did not fully describe the bedrock or provide test data to prove the tunneling was feasible; and because neither the MND nor the supporting studies included a plan for creating the tunnels. Dr. Nielson also suggested the placement of cave spoils, 2.3 feet deep across 6.2 acres, could lead to erosion into Bidwell Creek, and that the MND did not assess the stability of the natural soils upon which the cave spoils would be placed or consider the potential for increased erosion.

The 2017 MND concluded the project, as mitigated, would have no significant effects on biological resources, geology, or water quality.

*Soil Erosion.* The MND explained that if the project were to cause substantial erosion and transport of sediment into the creek, it could affect steelhead or coho habitat, but the project's conditions required best management practices during construction to minimize erosion. The project would generate approximately 21,000 cubic yard of cave spoils, which would be used as fill in specified areas of the vineyard and would meet a 100-foot setback from Bidwell Creek in compliance with the site's zoning and with the creek's designation under the Franz Valley Area Plan as a minor riparian corridor. Surface runoff would be routed through vegetated swales and vegetated buffer areas for treatment to mitigate pollutant loads in accordance with County requirements.

The MND explained that the County's grading ordinance requirements and the best management practices it had adopted were specifically designed to maintain potential water quality impacts at a less than significant level. It also noted that Knights Bridge had submitted a stormwater management plan and fill placement drawings showing the type and location of the best management practices that would be implemented. Based on the implementation of these practices, the small footprint of the project, and the distance to Bidwell creek, the MND concluded that "impacts to special

8

status species from project-generated sediment entering the creek would be less than significant." It also concluded the project would not alter the existing drainage pattern of the site in a manner that would result in substantial erosion.

*Slope Stability*. The MND's discussion of slope stability noted the presence of a large, ancient, and inactive landslide on the project site, and explained that it had been determined that the proposed winery and caves were outside the limits of the landslide. The potential for large-scale remobilization of the landslide was very low and acceptable from a geotechnical engineering viewpoint. Localized, smaller landslides and shallow sloughing could occur, perhaps including steeper areas upslope of the winery. Mitigation measures, as recommended in the Bauer report, included construction of diversion/catchment walls to contain 150 cubic yards of material; level buffer areas upslope of structures; adhering to all grading and surface/groundwater control recommendations; development and implementation of an erosion control and revegetation plan; monitoring of excavations by a geotechnical engineer or engineering geologist; and implementation of any additional measures deemed necessary based on geologic conditions observed during excavations.

### B. Analysis

As we have explained, appellants have the burden to point to substantial evidence in the record supporting a fair argument that the project (as mitigated) may have significant environmental effects. (See *Jensen*, *supra*, 23 Cal.App.5th at p. 886; *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 390.)

Appellants contend there is evidence to support a fair argument that the project's earthmoving and erosion may have a significant impact on the habitat provided by Bidwell Creek. They argue first that the MND does not provide sufficient information to evaluate these effects. In particular, they contend the MND does not include a geologic map or geologic cross sections. On the contrary, reports prepared by Richard C. Slade & Associates LLC (Slade), consulting groundwater geologists, and referred to in the mitigated negative declaration, contain geologic maps and cross-sections.

9

Appellants also point out that Bauer and Cotton Shires differed on certain geologic conclusions—that is, about the origin of certain deposits on the property. Despite this difference of opinion, Bauer and Cotton Shires agreed that, with the mitigation measures contemplated by Bauer, the project would be geotechnically feasible.

Appellants contend that Waldbaum and Nielson's criticism of the data, findings, and conclusions of the County's consultants is sufficient to support a fair argument that digging the caves will adversely affect slope stability. We are unpersuaded. The Bauer report contained an extensive discussion of the geology of the project area. In response to Waldbaum's criticism of the Bauer report, Cotton Shires submitted a detailed memorandum discussing the potential for slope instability and explaining that Bauer had incorporated mitigation measures designed to address the potential debris flow hazards in an acceptable manner. Although Nielson argued that reports upon which the MND relied did not fully describe the geology of the area and the MND was inadequate, she does not provide evidence that the project is reasonably likely to cause landslides or otherwise generate environmentally harmful releases of debris. (See *Pocket Protectors*, *supra*, 124 Cal.App.4th at pp. 928-929 [speculation and unsubstantiated expert opinion not substantial evidence for fair argument].)

We similarly reject appellants' contention that there is substantial evidence to support a fair argument that erosion from the project, particularly runoff from the cave spoils, will cause significant effects on Bidwell Creek and degrade the habitat the creek provides for salmonids. Nothing in the record indicates there is a fair argument that placement of the spoils on a two percent grade, at least 100 feet from the creek, covered with straw mulch, and isolated by erosion control measures, will significantly affect water quality in the creek. Nor is there evidence that compliance with the County's grading ordinance, its adopted best management practices, and the erosion control measures specified by Summit for use before and after construction will be insufficient to achieve that goal.

Appellants also suggest that, because the geology of the site was not adequately investigated, the County improperly deferred mitigation of environmental impacts by

10

relying on best management practices and the standards of the County's grading ordinance to mitigate unknown future effects. We disagree. "Deferral of the specifics of mitigation is permissible where the local agency commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated into the mitigation plan." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275.) That standard is met here. The record shows a detailed geological investigation, and the conditions of approval require Knights Bridge to conform to Bauer's recommendations for slope stability, including "construction of diversion/catchment walls to adequately retain 150 cubic yards of material, the provision of level buffer areas upslope of structures, adhering to all grading and surface/groundwater control recommendations, and development/implementation of an erosion control and revegetation plan." Bauer had recommended that graded slopes be planted with quick growing, dense vegetation or protected from erosion by other methods when grading was complete. In addition, a geological engineer or engineering geologist must monitor excavations during construction to confirm that the observed conditions conform to what was anticipated and implement any necessary additional measures based on observed conditions. This is not a case of mitigation that will be formulated after a mitigated negative declaration is approved. (See *Gentry v. City of Murietta*, *supra*, 36 Cal.App.4th at pp. 1396-1397 [where there was substantial evidence to support fair argument project would affect kangaroo rat, proposed mitigation could not be left for future formulation]; *Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 884.) We see nothing improper in adopting measures that reduce the project's expected environmental effects to a level of insignificance, but require monitoring and adjustments in the event of unanticipated conditions.

## III.  Groundwater Supply

Appellants contend there is substantial evidence to support a fair argument the project's groundwater use will significantly affect salmonids in Bidwell Creek, groundwater supply in neighboring wells, and fire suppression.

11

The County found the project would have a less than significant impact on groundwater supply and recharge. It explained that there were four wells on the project site, and that one of them, the "Residential Well," would be designated as the sole supply well for the project. Two other wells, the upper irrigation well and the Rattle Snake Hill well, would be used for the existing vineyards, and the fourth well, the lower irrigation well, would be capped and no longer used.

The original analysis of groundwater supply and recharge from the proposed project, completed in December 2013 by Slade, assumed the project would use 2.2 acre-feet of groundwater per year, less than nine percent of the estimated average annual groundwater recharge within the boundaries of the project site, and only a small fraction of the estimated 433 acre-feet of groundwater storage on the site. Taking into account the adjacent parcels and calculating anticipated future use, Slade concluded available groundwater would likely be only minimally affected.

The project was later revised to recycle water, reducing the project's net groundwater demand to 0.5 acre-feet per year. Then before the project was approved, Knights Bridge agreed to ensure *no net increase* in groundwater use over current conditions by reducing use elsewhere on the project site by at least 0.5 acre-feet per year. The County required conditions of approval to ensure conformity with these standards: designating the residential well as the dedicated supply for the project; requiring the residential well to be fitted with a groundwater-level measuring system; an easement allowing the County's employees and agents to collect water-meter readings and groundwater-level measurements; monthly monitoring of groundwater elevations and quantities of groundwater extracted; a water meter to measure all water use associated with the winery operation with monthly reporting of water use; and no net increase in groundwater use through measures including converting irrigated vineyards to dry farming, foregoing the right to replant existing vineyards, or removing existing vines.

Appellants argue that there is a disagreement among the experts about the boundaries of the aquifers that supply water for the project and for Bidwell Creek. In particular, they point to concerns raised by the National Oceanic and Atmospheric

12

Administration's National Marine Fisheries Service (NMFS) and Kamman. In January 2016, NMFS submitted a comment letter. It noted that Bidwell Creek had been designated as critical habitat for threatened CCC steelhead, which inhabit the creek seasonally, and for endangered CCC coho salmon, which are currently extirpated from the system. NMFS opined that the MND did not adequately assess the project's potential effects on Bidwell Creek streamflow and on steelhead and coho salmon. In particular, it argued that the then-current MND did not analyze the relative elevations of the aquifer and the stream, which would influence the amount of groundwater accretion to the streamflow in Knights Valley. Moreover, according to NMFS, examination of well log data for nearby properties suggested that the Knights Valley aquifer was in a state of overdraft, that the streamflow was being affected by unsustainable groundwater extraction, and that the proposed project would likely worsen that condition. Presently, Bidwell Creek stops flowing for much of the summer. NMFS also suggested the analysis should have considered a larger geographic area in order to characterize effects on streamflow, since groundwater pumping across the basin could cumulatively influence water-table elevation and connection to surface flow. NMFS argued that monitoring groundwater extraction would not mitigate the project's potential impacts; "[o]nly actions that appreciably offset or improve groundwater levels and/or Bidwell Creek streamflow should be considered mitigation measures for the potential impacts of the Project."

Slade responded to NMFS's comments on July 31, 2016. It stated that the project property was "completely underlain by the Sonoma Volcanics, and the Project well (the Residential Well) produces groundwater from the Sonoma Volcanics." Bidwell Creek was in the Knights Valley groundwater basin, and the residential well was outside that basin's boundaries and did not extract groundwater from it, remove water that is tributary to it, or contribute groundwater to it. Confirming this view, Slade had performed a pumping test that showed a lack of connection between the residential well and water levels in nearby wells and, thus, with aquifers in the Knights Valley groundwater basin. Slade also explained that, based on anticipated project groundwater demands (before

13

Knights Bridge undertook to ensure no net increase in groundwater use), the project would use only two to three percent of the estimated annual recharge at the property.

Another commenter, Kamman, had argued that the water level in the lower irrigation well was close to that of Bidwell Creek, which suggested that they were hydraulically connected and that pumping might affect groundwater flow to the creek. Slade responded that the lower irrigation well had been capped and was not being used for vineyard irrigation.

NMFS followed up on Slade's response on November 7, 2016. It noted the evidence that recharge to the Knights Valley aquifer occurs *principally* as infiltration from streambeds and from precipitation that falls on the basin floor, but argued that this fact does not preclude other forms of recharge to the basin, such as recharge from the Sonoma Volcanics at the project site. Kamman submitted new comments on behalf of appellants on October 27, 2016, making the same point. Kamman also made the point that a geologic cross-section showed that "groundwater movement beneath the volcanic hills underlying the site is towards the Knights Valley Groundwater Basin and must be providing some contribution of groundwater recharge to the basin." Kamman opined that pumping in wells that reduced groundwater storage in the Sonoma Volcanics beneath the project site would reduce the amount of groundwater available for flow and recharge of the Knights Valley groundwater basin, and that any reduction in groundwater contributions to Bidwell Creek could affect its habitat value.

In its May 15, 2017 peer review, O'Connor recommended further analysis of the project's potential effects on Bidwell Creek, and on July 3, 2017, Slade prepared a response. Slade reiterated that geologic data suggested the volcanic rock aquifer from which the residential well extracts groundwater is not in direct contact with Bidwell Creek. But, assuming that some portion of the water from the volcanic rock aquifer moved to the alluvium that fed into Bidwell Creek's stream flow, Slade calculated that the additional pumping of the residential well to meet project demands would reduce groundwater flow from the Sonoma Volcanics aquifer by 1.5 percent, and that only a small portion of that water would move into the creek. Moreover, the project's peak

14

demand month would be September, a month in which the creek is typically dry, and hence pumping would not reduce streamflow during that month. Slade concluded that any effects on Bidwell Creek from pumping the residential well for the project would be, at most, imperceptible.

Project opponents submitted evidence that neighboring well yields had been declining. In its July 31, 2016 response to comments, Slade argued that these reports were "not supported by water level or water use/metering data," and could possibly be accounted for by unrelated well performance issues and specific geologic conditions.

In its peer review, O'Connor pointed out that the "accepted use rate[]" for residential water demand was one acre-foot per year for primary residences. The total estimated water use for the winery was projected to be 0.74 acre-feet per year, with recycling measures reducing net consumption to 0.5 acre-feet per year. Annual groundwater demand in the "Cumulative Impact Area" composed of the project parcel and adjacent parcels, including vineyard irrigation and domestic use, would be about 38 percent of annual recharge; the amount attributable to the winery project would be about 0.5 percent of mean annual groundwater recharge in the cumulative impact area. The NMFS later pointed out that even a very small difference in streamflow elevation can affect habitat conditions for salmonids.

The evidence would certainly support a finding that the project will not cause significant effects on groundwater supplying Bidwell Creek and neighboring wells. The question before us, however, is whether there is substantial evidence to support a fair argument the project *will* have significant effects. We conclude the County properly found there was not. The project's water demand will be less than that of a residence, and a small fraction of mean annual groundwater recharge. The record indicates the aquifer underlying the project and that underlying Bidwell Creek are not in contact, but even assuming there is a geologic connection, there is no evidence the project would have any perceptible effect on the water flowing from one aquifer to the other, and thence to the creek.

15

Moreover, the conditions of approval require entirely offsetting the project's water use so there is no net increase in water use over the project site. Appellants contend these conditions are "illusory," but we disagree: They include monitoring of the well supplying the project and of groundwater elevations, and requiring Knights Bridge to reduce water use elsewhere on the property by specified methods with documentation for any methods it wishes to use in the future to meet the performance standard of "no net increase." Appellants argue that Knights Bridge will be free to use any well on the property to supply the project; however, we interpret the condition that the residential well is the "dedicated project supply well" to mean that it must be the project's exclusive source of water, and neither Knights Bridge nor the County have suggested otherwise. And if the winery's net water use exceeds 0.5 acre-feet per year or the project does not meet the "no net increase" performance standard, the County may bring the matter back for the Board of Zoning Adjustments to review additional measures to reduce water use. These facts support the County's finding that there is no substantial evidence to support a fair argument that the project will significantly affect groundwater resources.

Appellants also contend the County's General Plan required it to conduct a cumulative groundwater impact study and consult with neighboring well owners before granting the permit. But appellants are no longer litigating compliance with the General Plan. The question before us on this appeal is whether appellants have shown evidence to support a fair argument that the project will have significant environmental effects. On this record, we conclude they have not.

## IV. Visual Impacts

Appellants contend the County ignored the visual impacts of the project. Aesthetic issues are a proper subject of CEQA review. (*Protect Niles v. City of Fremont* (2018) 25 Cal.App.5th 1129, 1141.) Under the CEQA Guidelines, an agency should consider "whether a proposed project would '[s]ubstantially degrade the existing visual character or quality of the site and its surroundings.' (CEQA Guidelines, appen. G., § I, subd. (c), . . . [environmental checklist form].) The CEQA Guidelines specifically note that 'the significance of an activity may vary with the setting.')" (*Ibid.*, italics omitted.)

The 2017 MND stated that the site was not designated as a scenic resource by the Sonoma County General Plan, and that the winery would be centrally located in an 86-acre parcel and not visible from public roads. The MND concluded the project would cause no visual impacts.

Project opponents submitted evidence that an existing ten-bedroom residence on the property was visible from Highway 128, and it appears that both Highway 128 and Frantz Valley Road are scenic corridors. At the hearing on the appeal, a member of County staff told the supervisors that the upper level of the winery might be visible from some areas on Franz Valley Road or Highway 128, depending on the vegetation. She also said that the winery would be set into the hillside, rather than on top of the ridgetop; there would be trees behind the winery; and the winery would be required to have a dark-colored exterior, a nonreflective rooftop, and landscaping. The project's conditions of approval reflected these limitations: they specified that before a building permit was issued, the project would be subject to review and approval by the Design Review Committee, that the design would be evaluated "on the basis of harmony with site characteristics in regard to height, texture, color and roof characteristics," that exterior finishes would be dark, earthy colors and the roof dark and non-reflective, and exterior lighting would be low mounted, downward casting and fully shielded to prevent glare. Also, existing trees would be preserved in accordance with an arborist's report that had been prepared, and trees would be planted to screen the structure from public roads.

An errata sheet amended the MND to omit the statements that the winery would not be visible from public roads. It stated, "The upper level of the building may be visible from public roadways."

Appellants have not met their burden to show there is substantial evidence supporting a fair argument that the project will cause significant aesthetic impacts. They point primarily to evidence that an existing residence on the property is visible from Highway 128, but they described this residence as "at the very top of the property," and "on the ridge above the winery site." Pictures of the residence show that the building is light-colored and largely unshielded by vegetation. These things are not true of the

17

winery: County staff testified that although the upper portion of the winery might be visible from local roads, vegetation could block that view, and in any event, it would not be on a ridgetop where an "architectural hard line" would be visible, but set into the hillside. The conditions of approval require dark colors on the exterior and landscaping to provide screening. So the unsightliness of the existing residence is not substantial evidence that the winery building, in an area zoned for wineries and tasting rooms, will create a significant aesthetic impact.

In reaching this conclusion, we recognize that lay public commentary may constitute substantial evidence supporting a fair argument of significant aesthetic effects. (See, e.g., *Georgetown Preservation Society v. County of El Dorado* (2018) 30 Cal.App.5th 358, 375-376 [a large number of people testified that project in historical center of Georgetown was too big, boxy, or monolithic to blend in; sufficient evidence that project might impair "central district's unique and treasured Gold Rush character"]; *Pocket Protectors*, *supra*, 124 Cal.App.4th at p. 937 [opinions of area residents based on direct observation may be relevant to aesthetic impact of long double rows of houses on narrow street and insufficient landscaping].) For the reasons we have explained, however, in this case the opinions of local residents, based largely on the views of a different structure, do not constitute substantial evidence that the winery will have a significant aesthetic impact.

Appellants contend that the County failed to assess the project's visual impacts and improperly relied on future design review as a substitute for CEQA analysis. They also argue that the County ignored its own zoning ordinance, which provides that "No permit shall be issued for any project requiring design review approval unless and until drawings and plans have been approved by the design review committee. . . . " (Sonoma County Code, § 26-82-050(a)), and that this violation provides substantial evidence of a CEQA violation. In the circumstances of this case, these contentions do not persuade us that the County abused its discretion in concluding there was no fair argument that the project's aesthetic impacts would be significant. The conditions of approval themselves require vegetation and a dark, nonreflective exterior, rather than merely relying on a later

18

determination of these matters. They do not improperly defer mitigation, since they set standards to guide the County in reviewing the project's design. (See *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 794.)

## V. Fire Hazards

### A. Judicial Notice

Appellants have asked us to take judicial notice of a June 11, 2018 agenda item for the County's Board of Supervisors entitled " 'Emergency Operations Center After Action Report, Community Alert & Warning Program Assessment and Emergency Management Program Assessment,' " which discusses the wildfires of October 2017, including the Tubbs and the Nuns fires. We deny the request for judicial notice. The agenda was not part of the administrative record, and it was created—and considered events that occurred—*after* the County approved the project. (See *Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1192 [denying request for judicial notice of report that was not part of administrative record]; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 578-579 [extra-record evidence that could not have been produced at administrative level in exercise of reasonable diligence admissible in traditional mandamus proceedings only if it existed before agency made decision]; Guidelines, § 15162(c) ["Information appearing after an approval does not require reopening of that approval"].)

### B. The Merits

Appellants contend an EIR is necessary to examine the project's fire hazards. The Board found: "The project is consistent with the Public Safety Element of the General Plan related to fire hazard . . . because it includes fire protection features, including a fire engine turnaround, access road of adequate width, and water storage. Water storage for fire suppression, including both fire-fighting and water feed for sprinklers in the winery structure and wine caves, will be located on a concrete pad behind the winery structure and at a sufficient height that allows for effective gravity feed. The County Fire Marshal's Fire Safe Standards require that fire sprinklers be installed in new structures to contain or prevent fires from spreading from structures to wildlands fires. . . .

19

Compliance with the Fire Safe Standards will ensure that the exposure of people and property to fire hazards would be reduced to a degree that the risk of injury or damage is less than significant." The MND also concluded the project's wildland fire risk was less than significant.

Appellants argue that a fair argument exists the project will significantly increase the risk of fire hazards, including wildfires. As they point out, a project may have a significant environmental effect by increasing the risk of fire hazards. (See *Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 193.) They argue that the project is in a very high fire hazard severity zone (see Gov. Code, § 51178), that it has limited groundwater capacity, and that the County failed to consider the severity of fire hazards in violation of its General Plan. (See *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 311 ["The agency should not be allowed to hide behind its own failure to gather relevant data"].) And they contend the County failed to address the risks posed by a facility with an extensive electrical system and the logistics and limitations faced by the local volunteer fire department.

We are unpersuaded. The project is subject to the County's permit requirements, and it includes fire suppression measures, such as sprinklers in the winery and wine caves and an emergency water supply in compliance with County standards, as well as adequate emergency access for firefighters. There is no indication that the activities at the winery will cause an elevated risk of fire. Knights Bridge will be required to maintain vegetative fuels in compliance with fire regulations. And to the extent appellants are arguing that fire protection services are already stretched thin, "[t]he need for additional fire protection services is not an *environmental* impact that CEQA requires a project proponent to mitigate." (*City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833, 843.) Appellants have not pointed to substantial evidence for a fair argument that there is a reasonable possibility the project, as conditioned, will significantly increase the risk of wildfires.

Appellants also contend the County failed to consider whether the project's groundwater use will contribute to lower groundwater levels and affect the availability of

20

water during fire season.  We have already concluded that the County properly found there is no fair argument the project as approved will significantly affect groundwater supplies.

* * * * * * * * * * * * * * * * * * * *

Although appellants do not here obtain the relief they have sought, we note that a persistent explanation for this outcome is the success appellants already achieved in getting modifications to the project and the analysis of its environmental effects.  In response to early concerns raised by appellants and others, Knights Bridge and its consultants made important concessions, for instance by reducing the project's water demand, agreeing not to increase net groundwater use on the project site, and developing a plan for the cave spoils.  The record lacks substantial evidence to support a fair argument that, as now mitigated, the project is reasonably likely to cause significant environmental effects.  The County properly adopted the mitigated negative declaration.

## DISPOSITION

Appellants' March 21, 2019 request for judicial notice is denied.  The judgment is affirmed.  Appellants are to pay costs on appeal.

_____

TUCHER, J.

WE CONCUR:

_____

POLLAK, P. J.

_____

BROWN, J.

*Maacama Watershed Alliance v. County of Sonoma* (A155606)

22

Filed 10/7/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MAACAMA WATERSHED ALLIANCE et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>COUNTY OF SONOMA et al.,<br><br>      Defendants and Respondents;<br><br>JAMES BAILEY and KNIGHTS BRIDGE VINEYARDS, LLC,<br><br>      Real Parties in Interest. | A155606<br><br>(Sonoma County<br>Super. Ct. No. SCV261451)<br><br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION** |

**THE COURT:**


      The opinion in the above-entitled matter filed on September 6, 2019, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports pursuant to rule 8.1105(b) of the California Rules of Court, and it is so ordered.



Date: _____          _____ P. J.

                              POLLAK, P. J.

1

| | |
|---|---|
| Trial Court: | Sonoma County Superior Court |
| Trial Judge: | Hon. Rene Auguste Chouteau |
| Counsel for Appellant: | Law Office of Edward E. Yates, Edward E. Yates |
| Counsel for Respondent: | Bruce Goldstein, Sonoma County Counsel; Holly E. Ricket, Deputy County Counsel |
| Counsel for Real Parties in Interest: | Perkins Coie LLP, Brien F. McMahon, Michelle W. Chan, and Jacob E. Aronson |

*Maacama Watershed Alliance v. County of Sonoma* (A155606)